(No. 6793.  October 21, 1940.)

ADA L. RAUERT, Respondent, v. LOYAL PROTECTIVE INSURANCE CO. OF BOSTON, MASSACHUSETTS, a Corporation, Appellant.

[106 Pac. (2d) 1015.]

Richards & Haga, for Appellant.

Robert E. Lietch and George Donart, for Respondent.

HOLDEN, J.—August 27, 1931, the Loyal Protective Insurance Company of Boston, Massachusetts, issued and sold to William Rauert what is termed a "Permanent Protection Policy" in the principal sum of $2,000. The policy states it is non-cancellable, and provides indemnity for loss of life, limb, sight or time by accidental means, or of time by disease,

as limited therein. The pertinent provisions of the policy follow:

"Loyal Protective Insurance Company of Boston, Massachusetts does hereby insure Wm. Rauert, subject to the provisions and limitations hereinafter contained, endorsed hereon or attached hereto, against loss resulting from bodily injury effected directly and independently of all other causes by accidental means, and against loss resulting from disease originating after thirty days following the date hereof."

"GENERAL CONDITIONS AND PROVISIONS. . . . .

E. Indemnity shall not be payable for death due to disease, whether acquired accidentally or otherwise, nor for injury unless same be the result of accidental means, and not wholly or partly, directly or indirectly, the result of disease. . . . . "

June 14, 1938, the insured and his son, James Rauert, were unloading a barrel of buttermilk from a truck. The barrel weighed 450 pounds. As they were moving the barrel over the side of the truck the entire weight was suddenly shifted onto the two men and they had "to catch it all at once." That evening the insured complained of illness and suffered vomiting spells all night. The next day he was taken to the office of the family physician, Dr. J. C. Woodward. June 19, 1938, he was taken to Weiser and hospitalized. The following day he was moved to St. Luke's Hospital at Boise and operated upon for internal hernia. He died at the hospital July 18, 1938.

Notice of the injury and death, respectively, were immediately given the company. It denied liability, claiming the "policy does not provide benefits either for loss of time or death on the basis of 'accidental injury' " and further asserting the hernia was attributable in whole or in part, directly or indirectly, to a disease of the insured. The company, however, tendered a check for $146.14 "to cover indemnity for loss of time under the sickness provisions."

November 19, 1938, insured's widow, beneficiary under the policy, commenced this action to recover the principal sum of the policy, alleging the issuance of the policy, that it was in force and effect at the time of Rauert's death, the accident resulting in the death of insured, and "that the death of said William Rauert was caused directly and independently

of all other causes by the said bodily wrench or bodily strain so received by him in unloading said barrel of buttermilk.''

Appellant answered, admitting the issuance of the policy and that it was in effect at the time of the insured's death, but denied liability. The case was tried to a jury November 15, 1939. At the close of respondent's case appellant moved for judgment of nonsuit upon the grounds (a) respondent had failed to present any proof showing that the death of the insured resulted from bodily injury effected directly and independently of all other causes by accidental means; (b) respondent had affirmatively shown that the death of the insured had resulted wholly or partly, directly or indirectly, from disease or bodily infirmity and was not due solely and exclusively to accidental means. The court denied the motion. And after the submission of all the evidence and both parties had rested, appellant moved for a directed verdict upon substantially the same grounds set forth in the motion for judgment of nonsuit. The court likewise denied the motion for directed verdict.

Following argument of counsel for the respective parties, the court by instructions Nos. 4 and 5 instructed the jury as follows:

''You are instructed that if you find from the evidence that William Rauert received an accidental injury commonly known as a hernia or rupture and that such injury was the active efficient cause which set in motion and induced other agencies, including septicaemia, which resulted in his death, without the intervention of any other independent force, then and in that event the said injury so commonly known as hernia or rupture should be regarded as the sole and proximate cause of his death.''

''You are instructed that an injury received from the operation of known and usual causes and which injury is neither expected or designed, is an injury by accidental means within the meaning of the policy of insurance sued upon in this action.''

Appellant requested the court to give the following instructions, Nos. 3 and 4:

(3) ''The policy sued on provides that the defendant shall pay to the plaintiff, as beneficiary, the sum of $2,000 in

the event of the death of the assured resulting from bodily injury effected directly and independently of all other causes by accidental means, but not for death due to disease, whether acquired accidentally or otherwise, not for injury unless the same be the result of accidental means, and not wholly or partly, directly or indirectly, the result of disease. These provisions are a proper matter of contract between the parties, and having entered into the contract, all parties thereto, including the beneficiary, the plaintiff in this action, are bound by its stipulations.

"I instruct you, therefore, that the insurance does not cover any cause of death when brought about either directly or indirectly, wholly or in part, by or from any infirmity or disease, but only loss resulting from bodily injury caused by accidental means.

"The terms 'accident' and 'accidental means' as used in the policy sued upon are used in their ordinary popular sense, and the policy distinguishes between accidental means and accidental or unexpected results from a voluntary act. Defendant is liable only under the terms of the policy when the means by which the injury was caused were accidental means. A person may do certain acts, the result of which acts may produce unforeseen consequences, and may produce what is commonly called 'accidental death,' but if the means are exactly what the man intended to use and did use, then the means were not accidental and, if you find in this case that the insured William Rauert, did what he intended to do in the lifting or unloading of the barrel of buttermilk, and that the injury resulted from straining in doing what he so intended to do, then your verdict must be for the defendant."

(4) "If you should find that the assured did sustain an injury by accidental means as defined in these instructions, but if you also find that at the time of the accident he was suffering from a pre-existing disease or bodily infirmity, in this case an opening surrounded by a fibrous ring in the membrane supporting the intestines, and if the accident alone could not have caused his death if he had not been affected by such disease or infirmity, but that he died because the accident aggravated the effects of the disease or the disease

aggravated the effects of the accident, then the death of the assured would be due partly to the disease or infirmity and partly to the accident, and in such cases the policy contract exempts the defendant from liability and your verdict should, in that event, be for the defendant.''

The court refused to give the requested instructions. The jury returned a verdict in favor of respondent for the sum of $2,000 and interest. Judgment was entered on the verdict, from which this appeal is prosecuted.

Appellant contends the judgment appealed from should be reversed upon the grounds (a) that there was no injury by ''accidental means'' as a condition for liability under the contract of insurance; (b) that the death of the insured was due ''wholly or partly, directly or indirectly,'' to disease or conditions or infirmities existing prior to the alleged accident; (c) that the court erred in its instructions to the jury (hereinabove quoted) and in refusing to give instructions requested by the appellant (also hereinabove quoted); (d) and that the court erred in refusing to grant its motion for nonsuit.

In support of the first ground relied upon by appellant for a reversal of the judgment appealed from it is insisted there was no injury by *accidental means,* in ''that the barrel of buttermilk was unloaded as the insured and his son *intended to unload it,* and that there was no *accident* in connection with such unloading.'' The insured and his son, James, were alone when the barrel was unloaded. The son testified on direct examination:

Q. ''And how did you unload it?

A. Slid it off the side of the truck.

Q. Did your father engage in unloading it?

A. Yes, the both of us.

Q. Tell us how you did it.

A. We laid the barrel down and then slid it off, over to the side and then we started it over the side; and when it came over, it came all at once and we had to catch it.

Q. What kind of a hold did you have on it?

A. On the bottom and on the top.

Q. Each one of you?

A. Yes, at the side of it.'' . . . .

Q. "What did you mean when you said, when you got it over the side it came all at once and you had to catch it?

A. Well, when the band came over the edge on the steel edge of the bed the barrel came all at once and we had to catch it.

Q. You had to stop it by manpower?

A. Yes, sir."

On cross-examination he testified:

Q. "This barrel was unloaded as you intended to unload it, I assume.

A. Yes, sir.

Q. You had been in the habit of unloading barrels of buttermilk the same as this at other times?

A. Yes, sir."

This evidence shows just how the barrel was unloaded by the insured and his son, that "we laid the barrel down and then slid it off, over to the side and then we started it over the side; and when it came over, it came all at once and we had to catch it;" that they "had been in the habit of unloading barrels of buttermilk the same as this at other times." In other words, in unloading barrels of buttermilk from the truck they "had been in the habit" of laying the "barrel down" and sliding it over to the side—that that was the method theretofore habitually employed. But something happened June 14, 1938, which is not shown to have happened before, to wit: "it [the barrel] came all at once [when they slid it over to the side] and we had to catch it"—"stop it by manpower."

Appellant argues "the decedent was insured not against accidental or unexpected results of intended means, but against death resulting from bodily injury effected directly through *accidental means*," citing, among other cases, *Stone v. Fidelity & Casualty Co.*, 133 Tenn. 672, 182 S. W. 252, Ann. Cas. 1917A, 86, L. R. A. 1916D, 536, which holds, applying the rule of *strictissimi juris*, it is not sufficient that the *injury* be *unusual* and *unexpected* but that the *cause itself* must have been *unexpected* and *accidental*.

In the case at bar the *cause* of the *injury* was that the barrel "came all at once [having been slid over to the side of the truck] and we had to catch it"—"stop it by man-

power." It may safely be assumed the barrel never, on any previous occasion, "came all at once," and that they never had "had to catch it"—"stop it by manpower." Not having happened on any previous occasion, the conclusion is inescapable that the *cause* of the *injury,* to wit, the barrel going over the side of the truck "all at once," in other words, suddenly, so that the insured and his son "had to catch it"— "stop it by manpower," "must have been unexpected and accidental," thus bringing the respondent well within the rule held in the Stone case, *supra,* and other cases cited and relied upon by appellant, but which, however, we must not be understood as adopting.

It is a matter of common knowledge insurance contracts are not entered into as other contracts generally are. As was well said in *Browning v. Equitable Life Assur. Soc.,* 94 Utah, 532, 72 Pac. (2d) 1060, 1073:

"Insurance policies, while in the nature of written contracts, are not prepared after negotiations between the parties, to embrace the terms at which the parties have arrived in their negotiations. They are prepared beforehand by the insurer, and the company solicitors then sell the insurance idea to the applicant. Normally, the details and provisions of the policy are not discussed, except that the particular form of policy is best suited to give the applicant the protection he seeks. If he reads the policy he is generally not in a position to understand its details, terms, and meaning except that, in the event against which he seeks insurance, the company will pay the stipulated sums. He seldom sees the policy until it has been issued and is delivered to him. He signs an application blank in which the policy sought is described either by form number or by a general designation, pays his premium, and in due course thereafter receives, either from the agent or through the mails, his policy. Many of its terms and all of its defenses and super-refinements he has never heard of and would not understand them if he read them. Such fact is evident from the fact that cases like this arise where lawyers and courts disagree as to what such provisions mean. In fact, there are about as many different constructions by the courts of terms such as those involved

here as there are insurance companies issuing such policies. For this reason the rule of *strictissimi juris* has been applied almost universally to insurance contracts, and this jurisdiction, like many others, has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid.''

This court, like the Utah Supreme Court (*Browning v. Equitable Life Assur. Soc., supra*), is committed to the rule of liberal construction of insurance policies. In *Sweaney & Smith Co. v. St. Paul etc. Ins. Co.*, 35 Ida. 303, 315, 316, 206 Pac. 178, we held that a ''clause in an insurance policy being susceptible of more than one construction, the one most favorable to the insured will be adopted (citing cases). Contracts of insurance should be considered in view of their general objects and the conditions prescribed by the insurers, *rather than on the basis of a strict technical interpretation*'' (emphasis ours). The rule of liberal construction was later adhered to in *Sant v. Continental Life Ins. Co.*, 49 Ida. 691, 291 Pac. 1072; *Maryland Casualty Co. v. Boise Street Car Co.*, 52 Ida. 133, 11 Pac. (2d) 1090; *Watkins v. Federal Life Ins. Co.*, 54 Ida. 174, 29 Pac. (2d) 1007; *Kingsford v. Business Men's Assur. Co.*, 57 Ida. 727, 68 Pac. (2d) 58.

Turning now to the terms of the contract of insurance pertinent to this discussion, we find it provides ''against loss resulting from bodily injury effected directly and independently of all other causes by *accidental means*'' (emphasis ours). But as to what constitutes ''accidental means'' the courts are not agreed. Appellant insists this clause should be construed to mean that if the insured was injured while doing something he intended to do, that is to say, while unloading the barrel (which certainly he intended to do), then ''that there was no *accident* in connection with such unloading,'' which construction would, of course, be most favorable to the insurer and prevent a recovery. But if we construe the clause most favorably to the insured, in view of its general object, ''rather than on the basis of a strict technical interpretation,'' it must be construed to protect the insured against loss by bodily injury, neither expected nor designed,

suffered while, for instance, performing manual labor—thus, by the application of the liberal rule of construction, permitting recovery.

It follows, therefore, appellant's motion for nonsuit, motion for directed verdict, and requested instructions, all of which were based, it will have been observed, on the theory that "a person may do certain acts, the result of which acts may produce unforeseen consequences, and may produce what is commonly called 'accidental death,' but if the means are exactly what the man intended to use and did use, then the means were not accidental," were properly denied and refused, and that the jury was properly instructed.

■ The record discloses that several years prior to the accident in question insured suffered a hernia or rupture which necessitated an operation; as a result of the operation adhesions formed a fibrous ring on the abdominal wall. The accident caused loops of the bowel to be forced through the ring, causing strangulation and obstruction of the bowel resulting in blood-poisoning. Appellant contends the adhesions were, in fact, a disease and that death of the insured was caused by disease and not by accident and hence respondent cannot recover.

Dr. James L. Stewart, a witness for appellant, testified:

Q. "This ring, as I understand it, there was an opening there, a hole?

A. An opening through it, yes.

Q. And the border of the hole consists of fibrous—

A. Of fibrous scar tissue, yes." . . . .

Q. "This opening and ring that you spoke of was a diseased condition of the body.

A. Yes, it was an adhesion, or an old adhesion, that happened to have a hole through it."

And Dr. Howard M. Chaloupka, also a witness for appellant, testified:

Q. "And you heard the testimony of Dr. Stewart with reference to the effect of the fibrous ring of the patient and the cause of the hernia or the intestine protruding through the fibrous ring.

A. Yes." . . . .

Q. "Yes. Was that opening which is referred to as the fibrous ring a normal condition of the human body.

A. No, sir.

Q. That was the result, that was a diseased condition, an unsound condition.

A. It was the result of the previous adhesions.

Q. And when such rings are formed, do the intestines quite frequently protrude through the ring and become obstructed.

A. Yes, when such rings are formed."

But Dr. J. C. Woodward, witness for respondent, testified:

Q. "How did you determine the previous operation for hernia.

A. All I knew was he told me so, and at the time of the operation I was a friend of the family and I knew he had it.

Q. It was a matter of years before the illness in the year 1938.

A. I think so, but I do not know the length of time.

Q. Adhesions are ordinarily caused by infection from causes and also from operations.

A. Yes, sir, intra-abdominal.

Q. They are evidently all infirmities in the body evidence of some disease.

A. In this case it was from operation and resulted from that.

Q. From disease resulting from operation.

A. I would not call it disease."

While Dr. Stewart answered the leading question: "Q. This opening and ring that you spoke of was a diseased condition of the body"—"A. Yes, it was an adhesion, or an old adhesion, that happened to have a hole through it," it is not clear whether he intended to testify that the fibrous ring was in fact a disease or simply an adhesion. And it will be noted that neither Dr. Stewart nor Dr. Chaloupka used the word "disease." However, Dr. Woodward testified that he *"would not call it disease;"* in other words, that it was not a disease. The jury found against appellant and under the well settled rule its verdict will not be disturbed.

It follows the judgment must be affirmed and it is so ordered. Costs awarded to respondent.

Budge, P. J., Givens and Morgan, JJ., concur.

Ailshie, C. J., deeming himself disqualified, did not sit at the hearing or participate in the decision.

Petition for rehearing denied.