(Nos. 7173, 7174, 7175. October 25, 1944.)

ROWENAH K. O'NEIL, Appellant, v. NEW YORK LIFE INSURANCE COMPANY, a corporation, Respondent.

(152 P. (2d) 707.)

St. 'Clair, Peterson & St. Clair, and Oscar W. Worthwine, for appellant O'Neil.

Otto E. McCutcheon, for respondent and cross-appellant, New York Life Insurance Company.

HOLDEN, C. J.—December 12, 1928, the New York Life Insurance Company, hereinafter called the "Company," issued to James Edward O'Neil double indemnity accident insurance contract, policy No. 10,463,864, in the amount of $1,000.00. January 14, 1930, the Company also issued to O'Neil double indemnity accident insurance contract, policy No. 11,352,618, in the amount of $1,000.00. These policies, among other things, provided: "That such double indemnity shall not be payable if the insured's death resulted from—committing an assault or felony."

February 6, 1934, the Company issued to O'Neil double indemnity accident policy No. 12,234,926, in the amount of $2,000.00. March 27, 1934, the Company issued to O'Neil double indemnity accident policy No. 12,272,042, in the amount of $1,000.00. The last two policies carried the provision, pertinent here: "That such Double Indemnity shall not be payable if the Insured's death resulted, directly or indirectly, from—committing an assault or felony." Plaintiff was the beneficiary in all of the policies.

August 9, 1942, the said O'Neil and one Dewey Foreman engaged in an altercation. A few hours later O'Neil died as a result of injuries received during the course of the altercation. Thereafter Rowenah K. O'Neil, widow of the said James Edward O'Neil, named as beneficiary in the said policies, brought this action to recover the double indemnities provided for in the said insurance contracts. The jury found in favor of the plaintiff and against the Company on the first two policies, above mentioned, and in favor of the Company and against the plaintiff on the last two. From a judgment entered on the verdict in favor of the plaintiff, the Company appeals, and from the judgment entered on the verdict in favor of the Company and against the plaintiff, the beneficiary appeals.

The beneficiary insists that "Where a result is tragically out of proportion to its trivial cause it is something unforeseen, unexpected, extraordinary and unlooked for and it is an accident," and further that "if the result of an act was not natural and probable and should not reasonably have

been foreseen, it was brought about by accidental means" and requested instructions so instructing the jury, which the trial court refused to give. On the other hand, the Company contends, as we understand it, that any kind of an assault, trivial, simple or aggravated, defeats a recovery under either of the above quoted provisions of the contracts of insurance, and furthermore, and to illustrate the theory and position of the Company, "it is urged that the insured must be wholly free from culpability. There can be no valid argument made herein that O'Neil was free from culpability."

In *Clancy v. John Hancock Mut. Life Ins. Co.*, 282 N. Y. Supp. 510, it appears that:

"In the early hours of the morning of July 19, 1934, in a night club in Long Island City, Clancy became involved in an argument with a stranger, a man about his own age. Both had been drinking rather heavily. (In the case at bar the evidence shows that Foreman and O'Neil were strangers and presumably both had been drinking.) During the course of the discussion Clancy invited the stranger 'outside,' when Clancy made a pass at the stranger, evidently intending to strike him, whereupon the latter pushed Clancy, who fell and struck his head. Clancy was removed to a hospital, where he died a few hours later from a fractured skull."

In the course of the opinion it is said:

"The court's point of view, in fixing the meaning of the word 'accident' in the contract at bar, must be that of the average man. 'Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, and unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts.' (*Lewis v. Ocean Accident & Guarantee Corporation, Limited, of London, England*, 224 N. Y. 18, 21, 120 N. E. 56, 57, 7 A. L. R. 1129.) The language just quoted seems to me to be applicable to the situation presented by the manner of Clancy's death. The average man would probably consider him the aggressor in his quarrel with the stranger. But it is not consistent with the experience of the average man that the one who enters into a brawl with his bare hands does so with the expectation that it may result fatally, if he has no reason to believe his

antagonist is armed. At bar, 'the dire result, so tragically out of proportion to its trivial cause,' was something entirely unforeseen." [sic.]

Later, in a rather recent case, the New York Court of Appeals, in *Mansbacher v. Prudential Ins. Co. of America,* 7 N. E. (2d) 18, cited and approved *Clancy v. John Hancock Mut. Life Ins. Co.,* supra, and quoted Cooley, *Briefs on the Law of Insurance,* Vol. 4, First ed., p. 3156: " 'Strictly speaking, a means is accidental perhaps only when disassociated from any human agency, but this narrow interpretation is not recognized in the law of accident insurance.' "

In *Lewis v. Ocean Acc. and Guarantee Corp.,* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129, it appeared the insured had a pimple on his lip which he punctured and it became infected, from which infection the insured later died. The question was as to whether the injuries resulting from the infection were effected by accidental means. The trial judge dismissed the complaint. On appeal, Mr. Justice Cardozo, then an associate justice of the New York Court of Appeals, speaking for that court, said:

"Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself, the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. To the scientist who traces the origin of disease there may seem to be no accident in all this 'Probably it is true to say that in the strictest sense, and dealing with the region of physical nature, there is no such thing as an accident.' But our point of view in fixing the meaning of this contract must not be that of the scientist. It must be that of the average man (citing cases.) Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts. (citing many cases.)"

Furthermore, it was held in *Western Commercial Travelers' Association v. Smith,* (C. C. A. 8) 85 Fed. (2d) 401, 405, 406, 40 L. R. A. 653, that:

"an effect which is not the natural or probable consequence of the means which produced it, an effect which does

not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means. (citing cases)"

To the same effect: *Jensma v. Sun Life Assur. Co.,* (C. C. A. 9), 64 Fed. (2d) 457; *Mutual Life Insurance Co. v. Dodge,* (C. C. A. 4) 11 F. (2d) 486, 488, 59 A. L. R. 1290; *Preferred Accident Ins. Co. v. Patterson,* (C. C. A. 3) 213 F. 595, 597; *Aetna Life Ins. Co. v. Brand,* (C. C. A. 2) 265 F. 6, 8, 9, 13 A. L. R. 657, 64 L. ed. 1031; *Zurich General Accident & Liability Ins. Co. v. Flickinger,* (C. C. A. 4) 33 F. (2d) 853, 854, 855, 68 A. L. R. 161; *Norris v. New York Life Ins. Co.,* (C. C. A. 4) 49 F. (2d) 62, 63, 64; *New York Life Ins. Co. v. Gustafson,* (C. C. A. 3) 55 F. (2d) 236, 237; Cooley's *Briefs on Insurance,* (2d Ed.), vol. 6, p. 5234.)

Touching the construction of this Company's insurance contracts, this court, in *Bennett v. New York Life Insurance Co.,* 63 Ida. 427, 438, 121 P. (2d) 551, said:

"The fact is worthy of note and deserves some consideration, that the respondent herein, New York Life Insurance Co., is a New York corporation, engaged in the general life insurance business; that it was incorporated under the laws of New York and is subject to the supervision and control of the laws of that state. The decisions of the courts of New York, with reference to the provisions of this company's insurance contracts, and their construction, should elsewhere afford, at least persuasive reasons for following the construction and application of the various provisions of these contracts."

And we held in *Watkins v. Federal Life Ins. Co.,* 54 Ida. 174, 176, 29 P. (2d) 1007, that:

"Contracts of insurance are to be construed in view of their general objects and strict, technical interpretation is to be avoided. Where language may be given two meanings, one of which permits recovery and the other does not, it is

to be given the construction most favorable to the insured." (Citing cases.)

And, further, in *Rauert v. Loyal Protective Ins. Co.,* 61 Ida. 677, 106 P. (2d) 1015, this court, in the course of the construction of an insurance contract, in substance the same as the contracts in the case at bar, repudiated the doctrine announced by some courts that there is a distinction between accidental death and death by accidental means. In that case the insurance company insisted the insured was injured while doing just what he intended to do and that "the decedent was insured not against accidental or unexpected results of *intended means* (emphasis ours), but against death resulting from bodily injury effected directly through *accidental means*." In response to that contention this court said:

"Turning now to the terms of the contract of insurance pertinent to this discussion, we find it provides 'against loss resulting from bodily injury effected *directly* and *independently* of all other causes by *accidental means*.' But as to what constitutes 'accidental means' the courts are not agreed. Appellant insists this clause should be construed to mean that if the insured was injured while doing something he intended to do, that is to say, while unloading the barrel (which certainly he intended to do), then 'that there was no accident in connection with such unloading,' which construction would, of course, be most favorable to the insurer and prevent a recovery. But if we construe the clause most favorably to the insured, in view of its general object, 'rather than on the basis of a strict technical interpretation,' it must be construed to protect the insured against loss by bodily injury, neither *expected* nor *designed*, suffered while, for instance performing manual labor—thus, by the application of the liberal rule of construction, permitting recovery."

In the Rauert case, supra, this court quoted with approval the following from *Browning v. Equitable Life Assur. Soc.,* 94 Utah 532, 72 P. (2d) 1060, 1073:

" 'Insurance policies, while in the nature of written contracts, are not prepared after negotiations between the parties, to embrace the terms at which the parties have arrived in their negotiations. They are prepared before-hand by the insurer, and the company solicitors then sell the insurance idea to the applicant. Normally, the details and pro-

visions of the policy are not discussed, except that the particular form of policy is best suited to give the applicant the protection he seeks. If he reads the policy he is generally not in a position to understand its details, terms, and meaning except that, in the event against which he seeks insurance, the company will pay the stipulated sums. He seldom sees the policy until it has been issued and is delivered to him. He signs an application blank in which the policy sought is described either by form number or by a general designation, pays his premium, and in due course thereafter receives, either from the agent or through the mails, his policy. Many of its terms and all of its defenses and super-refinements he has never heard of and would not understand them if he read them. Such fact is evident from the fact that cases like this arise where lawyers and courts disagree as to what such provisions mean. In fact, there are about as many different constructions by the courts of terms such as those involved here as there are insurance companies issuing such policies. For this reason the rule of *strictissimi juris* has been applied almost universally to insurance contracts, and this jurisdiction, like many others, has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid.' "

There is much contrariety of judicial opinion as to whether and under what circumstances an assault will defeat recovery on double indemnity accident insurance contracts like those involved in the case at bar. We have carefully examined the cases cited and relied upon by the Company. We cannot follow those cases. We think the cases hereinbefore cited and reviewed are supported by the best reasoning. Nor do we think "that the principles involved here were decided by this Court favorable to the insurance company in the case of *Mabee v. Continental Casualty Co.*, 37 Ida. 667."

Briefly, it appears: that Mabee and one Wagoner had been "wrangling about a $5 bill which each claimed. This quarrel had lasted about fifteen minutes, and then Mabee and Wagoner stepped outside of Wagoner's store where the quarrel had taken place, and both squared off for a fight. The contestants were, however, separated, and Wagoner was sent indoors while Mabee was picked up, and it was from one to three minutes after Wagoner had gone into the

house, and when the backs of everyone present were turned to the house, that Wagoner rushed out and shot Mabee;" "* * * that Mabee had torn Wagoner's shirt in the quarrel, and had made his nose bleed; that after the fight Mabee seemed reluctant to leave when two Northern Pacific Railroad men endeavored to get him to come away from the place of the quarrel, and that after Wagoner had gone inside the building Mabee holloed in a loud voice, 'You German ———, I will kill you,' and that Wagoner came out later with a gun in his hand, and just after he struck Mabee said, 'What did you call me, you ———? What did you say you would do to me?' That the "fighting, quarreling and abusive language and conduct on the part of the deceased had stopped. The uncontradicted evidence conclusively showed that, as far as the deceased was concerned, the quarrel had been abandoned and was at an end. He had been picked up, had put on his coat, and was in the act of brushing off his hat, undoubtedly with the view of placing it upon his head and proceeding on his way, when he was shot and killed."

Upon that evidence the trial court instructed the jury:

"As to the issue that the death of the said Mabee was the natural, proximate and probable consequence of his unlawful assault upon the said Wagoner, and not the result of a personal bodily injury effected solely and independently of all other causes by the happening of an external, violent and purely accidental event, I instruct you that there is no evidence to sustain the same, and you will find for the plaintiff on that issue."

The question presented to this court in that case was as to whether the trial court erred in giving the above-quoted instruction. By that instruction, it will be observed, the court instructed the jury that there was no evidence (as contended by the insurance company) "that the death of the said Mabee was the natural, proximate and probable consequence of his unlawful assault upon the said Wagoner," and further, and for that reason, the jury should "find for the plaintiff (Mabee) on that issue." This court, in passing upon the question as to whether the trial court did, or did not, err in giving the above-quoted instruction, simply held "that the trial court did not err in holding that there was no conflict in the evidence on this point requiring its submission to the jury." If there had been a conflict

in the evidence, as in the case at bar, of course, that question of fact would, necessarily, have had to be submitted to the jury, just as all disputed questions of fact.

We conclude, in harmony with the cases above cited and reviewed, that if the result of an act was not natural and probable and should not reasonably, under all the circumstances, have been foreseen, and is tragically out of proportion to a trivial cause, it is an accident within the meaning of the above-quoted provisions of the insurance contracts in question here. Hence, the trial court erred in refusing to so instruct the jury, as requested by appellant by instructions numbered eight and ten.

And the trial court erred in refusing to instruct the jury as requested by appellant (Instruction No. 21) that the burden was upon the Company to prove its affirmative defenses "that the death of the insured, O'Neil, occurred within one of the exceptions contained in the policy." (*Mabee v. Continental Casualty Co.,* supra; *New York Life Ins. Co. v. Jennings,* (Ga.) 6 S. E. (2d) 431, 434; *Mah See v. North American Acc. Ins. Co.,* (Cal.) 213 P. 42, 44.)

Corpus Juris states the rule thus:

"Where the insurer seeks to avoid liability by reason of an alleged breach of the conditions of the policy, the burden rests upon it to show such breach; and, where it seeks to avoid liability on the ground that the accident or injury is within one of the exceptions in the policy, the burden rests upon it to prove facts bringing the case within the exception." (1 C. J., par. 288, p. 497.)

It follows the judgment in favor of the Company and against appellant must be, and is, hereby reversed and the cause remanded with directions to the lower court to grant a new trial. And inasmuch as the Company seeks a reversal of the judgment against it upon substantially the same grounds urged for an affirmance of the judgment against appellant, the judgment against the Company is affirmed. Costs awarded to appellant.

Ailshie, Budge, Givens and Dunlap, JJ., concur.