NEW YORK LIFE INS. CO. v. WILSON.

No. 12227.

United States Court of Appeals
Ninth Circuit.

Nov. 21, 1949.

As Amended Nov. 30, 1949.
Rehearing Denied Dec. 22, 1949.

J. L. Eberle, B. S. Varian, Dale O. Morgan, Boise, Idaho, for appellant.

B. W. Davis, Pocatello, Idaho, for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

Appellant in 1928 issued to appellee's husband a policy of life insurance providing for the payment to appellee of double indemnity upon proof that the death of the insured "resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means." The appeal is from a judgment in favor of the beneficiary under the double indemnity provision.

On April 7, 1947, the insured was operated on for hernia. He was at that time sixty-one years old and in the opinion of the operating surgeon was in the ordinary good health of the average man. Within a matter of twenty hours after the operation he died in consequence of pulmonary embolism. Evidence taken on the trial substantially shows, and the court found, that the embolus was produced by the extraordinarily violent coughing, choking and snoring of the insured resulting unforeseeably from the routine administration of opiates and sedatives incident to the operation. Death was found to have been accidental within the intendment of the insuring clause.

Reputable surgeons testifying by deposition for the insurer gave it as their opinion that the embolism was post-operative in character, that is, the result of a clot in the blood stream developing out of the operation itself. These experts were without first-hand knowledge of the circumstances of the case, and their testimony was accordingly of a general nature. The equally reputable and experienced surgeons who performed or aided in the operation, and whose testimony the court accepted, were of opinion that the embolism was not connected with the surgery, that it followed too soon after the surgery to have been caused by it. It was the belief of the latter physicians—Drs. Call and Brothers—that a thrombus existed in the body of the insured, formed in consequence of an abdominal operation performed four years earlier. A small particle or portion of the thrombus was broken loose as the result of the extreme exertion attending the violent coughing and choking; and this embolus, afloat in the blood stream, was the immediate cause of death. The death was characterized by the two as tragically unexpected. It should be added that while the insurer was given the opportunity of having an autopsy performed the opportunity was not availed of, notwithstanding an autopsy might have served to resolve conflicts.

The policy contained an exclusion clause reading: "Double Indemnity shall not be payable if the insured's death resulted from self-destruction, whether sane or insane; from the taking of poison or inhaling of gas, whether voluntary or otherwise; from committing an assault or felony; from war or any act incident thereto; from engaging in riot or insurrection; from participation as a passenger or otherwise in aviation or aeronautics; or directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection other than bacterial infection occurring in consequence of accidental and external bodily injury." The clause was pleaded by the insurer as a defense. The court found that the burden concededly resting on the Company to establish the defense was not sustained by evidence.

Two questions are presented by the record, (1) whether the death was accidental within the meaning of the insuring clause, and (2) whether assuming death by accidental means, recovery is nevertheless precluded by the terms of the policy exclusions. The contract is an Idaho contract and the court is obliged to resolve the questions as best it can in light of the state decisions.

We are of opinion that the finding of death by accident was not error. In Teater v. Dairymen's Cooperative Creamery, 1948, 68 Idaho 152, 190 P.2d 687, it was held that the death of a truck driver

from coronary occlusion precipitated by exertion of loading heavy packages in the performance of the driver's regular duties, thereby accelerating a pre-existing diseased condition of the heart, resulted from accident. The Industrial Accident Board had found that the death of the driver was not caused or accelerated as the result of any unexpected, undesigned, or unlooked-for mishap, hence it was not accidental. The Supreme Court concluded otherwise and directed the award of compensation. It is contended that the holding is inapposite, there being no insurance policy involved. However, the compensation statute under which the case was decided provides that a personal injury to be compensable must be the result of an accident,[1] and that the words "personal injury by accident" shall not include a disease except as it shall result from the injury.[2] And it is established by the cases that the term "accident" is used in the statute in its popular and ordinary sense as denoting an unlooked-for mishap or an untoward event not expected or designed. McNeil v. Panhandle Lumber Co., 34 Idaho 773, 203 P. 1068.[3]

Naturally the Teater case, supra, is of value only in considering what is accident per se. We are not forgetting that here the insuring clause required affirmative proof on the beneficiary's part that death resulted, independently of all other causes, from injury effected by accidental means. In Rauert v. Loyal Protective Ins. Co., 61 Idaho 677, 106 P.2d 1015, the language of the insuring clause was the same. The insured accidentally suffered an internal hernia while unloading a heavy barrel from a truck. The facts disclosed on the case for the beneficiary were that several years prior to the accident the insured had suffered a hernia necessitating an operation. As a result of the operation adhesions had formed a fibrous ring on the abdominal wall. The accident in question caused loops of the bowel to be forced through the small opening in the ring, causing strangulation and obstruction of the bowel resulting in blood poisoning and death. The court found no difficulty in determining that the beneficiary had discharged her burden of showing that death was effected by accidental means, independently of all other causes. In its opinion the court cited with approval Browning v. Equitable Life Assur. Soc., 94 Utah 532, 72 P.2d 1060, 1076.[4] It appeared in the latter case that an existing diseased condition (toxemia) contributed conjointly with sprain from an accidental fall materially to prolong a disability originating in the accident. Discussing an insuring clause identical with the one now being considered the Utah court observed that it was "not required to search beyond the proximate, efficient, and inducing cause to see if there may be latent causes." It held that the insured's proof fulfilled the policy conditions and that indemnity was payable for the full term of the disability. Consult the same case on petition for rehearing, 94 Utah 570, 80 P.2d 348 where policy exclusions comparable with the present were noticed and held not to preclude recovery.

The policy exclusions to be considered under the second question are, specifically, those where death results "directly or indirectly, from infirmity of mind or body, from illness or disease." We understand it to be the general view that provisions of this sort are strongly construed against the insurer, and that indemnity for death from accident covers death resulting from bodily infirmity or disease directly attributable to and proximately caused by the accident. Such provisions apply only to bodily infirmity or disease existing prior to the accident or contracted subsequent to and independently of the accident. Con-

---

1. § 72-1013, Idaho Code.

2. § 72-1014, Idaho Code.

3. Consult generally on what constitutes external, violent and accidental means, Jensma v. Sun Life Assur. Co., 9 Cir., 64 F.2d 457. The terms "accidental means" and "accidental result" are in Idaho regarded as legally synonymous. Rauert v. Loyal Protective Ins. Co., 61 Idaho 677, 106 P.2d 1015.

4. Similarly in O'Neil v. New York Life Ins. Co., 65 Idaho 722, 152 P.2d 707, hereafter discussed, the Browning case was relied on.

sult annotation to Ballam v. Metropolitan Life Ins. Co., 295 Mass. 411, 3 N.E.2d 1012, 108 A.L.R. 1, at page 21.

It becomes important, therefore, for present purposes to recall that the insured did not die of thrombosis, but of embolism. A thrombus and an embolus are not the same thing. They appear to be distinct, symptomatically and otherwise. Questioned as to the difference Dr. Brothers stated: "They are different conditions. Thrombosis may exist without symptoms, entirely without symptoms. Pulmonary embolism is very dramatic, a sudden thing, and causes death in a very few minutes if it is a large embolus." We gather from his testimony and from that of Dr. Call that a thrombus, as here understood, is a sizable clot adhering to the wall of a blood vessel. Its presence may be due to a variety of causes, such as prior surgery, injuries, varicose veins, and the like. As already observed, it was the opinion of these surgeons that a thrombus had existed in the insured's abdominal region since a prior operation performed four years earlier. There was no evidence that such a condition is progressive. An embolus on the other hand is a particle of a thrombus which for some reason becomes detached and floats in the blood stream. The embolus in this instance, according to the accepted medical opinion, was broken loose by the extraordinarily violent exertion of coughing and choking. So far as the record shows the insured, except for this mishap, might have lived out his days and died of old age without ever being aware that he had a thrombus.

As illustrative of the sometimes differing attitude of the courts toward the vexing problem of disease or bodily infirmity in this type of case, consult Wheeler v. Fidelity & Casualty Co., 298 Mo., 619, 251 S.W. 924; McMartin v. Fidelity & Casualty Co., 264 N.Y. 220, 190 N.E. 414, 415. Factually, the Missouri case cited is not too remote, and the court's process of reasoning tends strongly to support the decision below. It was held that if, under the peculiar condition of health of an individual injured, the injury appears as the active, efficient cause that sets in motion agencies resulting in death without the intervention of any other independent force, it should be regarded as the sole and proximate cause of death, though the victim's physical infirmity may be a necessary condition to the result. In the second case, decided by the New York Court of Appeals, the insured, a man of seventy, struck his chest against the steering wheel when his car collided with some object. At the hospital he complained of severe pain in the chest on breathing, and an X-ray disclosed some local injury. The pain cleared up within a few days. Twenty days later, without leaving his bed, the insured died of nephritis (inflammation of the kidneys). The disease, according to a witness for the plaintiff, had been chronic and progressive for a period of at least three years. "It is not claimed", said the court, "that nephritis was caused by the accident." It was held not enough for the plaintiff to show that the insured, because of his extensively diseased condition, was unable to withstand the shock of the accident. A decision of the Appellate Division holding the insurer liable, 239 App.Div. 296, 267 N.Y.S. 473, was reversed by the Court of Appeals, two of the judges of that fine court dissenting.

Unlike the New York case just discussed, the insured's existing thrombus would appear to have been merely a condition, not an efficient cause of death. The proximate cause, as found by the court, was the violent and unanticipated exertion productive of an embolus not theretofore present in the blood stream. The situation would seem, therefore, to fall logically within the general rule above outlined, namely, that despite policy provisions of the present type indemnity for death from accident covers death resulting from bodily infirmity or disease directly attributable to and proximately caused by the accident. We are not suggesting that this view of the matter would be likely to meet with universal acceptance; there is too much divergence of opinion among the courts to permit of that sort of prophecy. But from our study of the cases we are satisfied that many able courts would regard the un-

toward mishap in this instance as the inducing and sole proximate cause of the loss. Among such a group the Idaho court must be counted because of its uniform emphasis of a rule of interpretation favorable, wherever permissible, to recovery. Watkins v. Federal Life Co., 54 Idaho 174, 29 P.2d 1007; Rauert v. Loyal Protective Ins. Co., supra; O'Neil v. New York Life Ins. Co., 65 Idaho 722, 152 P.2d 707, 708. O'Neil v. New York Life Ins. Co., supra, is worthy of special notice for its narrow treatment of a specific policy exclusion. That case involved four policies the first two of which contained the provision that double indemnity for accidental death "shall not be payable if the Insured's death resulted * * * from * * * committing an assault". The provision in the other two was that the double indemnity was not payable if death resulted "directly or indirectly, from * * * committing an assault". A jury had returned a verdict for the beneficiary on the first two policies and for the insurance company on the others. The insured died within a few hours from injuries received in the course of a physical encounter or fist fight in which he had engaged with a stranger. Whether the insured was regarded as the aggressor or merely as a willing party to a mutual assault the Court did not state, but he was evidently one or the other. The Court said that "There is much contrariety of judicial opinion as to whether and under what circumstances an assault will defeat recovery on double indemnity accident insurance contracts like those involved in the case at bar. We have carefully examined the cases cited and relied upon by the Company. We cannot follow those cases." The judgment for the beneficiary was affirmed, and that in favor of the insurer was reversed for failure to instruct on the burden of proof.

The situation of pre-existing disease dealt with in Browning v. Equitable Life Assur. Society, supra, has already been sufficiently described; and the approval several times given that decision by the Idaho court carries a significance we are not justified in ignoring.

Judgment affirmed.

POPE, Circuit Judge.

I dissent. In my opinion the majority have completely disregarded the controlling Idaho decision and have ignored the clear and unequivocal language of the policy.

The exclusion clause, quoted at length in the majority opinion, provided that: "Double indemnity shall not be payable if the insured's death resulted * * * directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection * * *" etc.

The facts of the case as we must deal with them, are those disclosed by plaintiff's own witnesses,—those most favorable to her. The two physicians, whose testimony furnishes these facts, agreed that the thrombus, from which the death-causing embolus came, was a "bodily infirmity", which came about in consequence of an operation several years earlier, and that the thrombus was probably located in the pelvic veins. Dr. Call testified:

"Q. Then it was a condition within his body at the time of the last operation? A. Yes, sir.

"Q. It was what we could term a bodily infirmity? A. That's right.

"Q. If he had no bodily infirmity there could not have been an embolism? A. That is pretty broad. There are embolisms that form without bodily infirmities.

"Q. This was not such? A. This was bodily infirmity.

"Q. Whether you say it came from the operation performed on April 7, or whether it came from some other cause, it was from bodily infirmity? A. Yes, sir.

"Q. That was ultimately the cause of his death? A. Yes, sir."[1]

---

1. Dr. Brothers, the other physician called by plaintiff, testified on this point as follows:

"Q. You speak of embolism caused by thrombosis, now, what causes the thrombus? A. It is caused by different things; prior surgery; injuries; infection of the vessel walls; foreign material in the blood stream; endocarditis.

"Q. And everyone of those go back

The controlling authority here is Rauert v. Loyal Protective Ins. Co., 61 Idaho 677, 106 P.2d 1015. In that case the corresponding excluding clause read: "General Conditions and Provisions. * * * E. Indemnity shall not be payable for death due to disease, whether acquired accidentally or otherwise, nor for injury unless same be the result of accidental means, and not wholly or partly, directly or indirectly, the result of disease." In passing upon the effect of this clause, the court devoted itself to a review of the evidence as to the old adhesion in the bowel which made the fibrous ring which caused the bowel obstruction which resulted in death. It was pointed out that the medical testimony was that some of the doctors "would not call it disease". It was because there was at least a conflict of evidence upon this point that the court arrived at its conclusion that the verdict for plaintiff might stand.

Here, the exclusionary clause is broader, —it uses the words, "infirmity of mind or body" as well as, "illness or disease". And here there is no conflict or doubt whatever in or about the medical testimony,— both doctors pronounced the thrombus which resulted from the old operation a "bodily infirmity". Thus the condition is within the precise terms of the excepting clause, and there is no testimony to the contrary.

It cannot be said that these doctors did not choose their words carefully, because their description of the deceased's condition shows that its characteristics were such as must have been contemplated by the term "infirmity of body" as used in the policy, whether those terms be judged by medical, or lay, or any other standards. Dr. Call testified:

"Q. In ordinary life he would do it without an opiate? A. That's right.

"Q. His action during this operation and subsequent was no different than in ordinary life? A. That is correct.

"Q. This could have happened in bed

to a bodily infirmity? A. Injuries and prior operations, you would not call them diseases.

any night? A. Or walking down the street.

"Q. It was in no way due to the fact that he was in the hospital? A. He was quite a snorer in an operation or not in an operation.

"Q. His coughing and snoring was no different? A. No different except his condition was weakened by reason of his being a sick man.

"Q. Then you think this happened because of his weakened condition? A. Sure.

"Q. So after all, Doctor, the contributing cause was by reason of the weakened condition or bodily infirmity, by reason of his condition at that time? A. That's right."

Dr. Brothers testified:

"Q. Doctor Brothers, will you give us your opinion based upon the facts as produced here, which are available to you in this matter, as to whether or not this death would have been likely to occur under the same conditions, of extra-ordinary snoring and coughing, regardless of whether the operation had been performed or not?

"Mr. Merrill: Objected to as not proper, there is no foundation and it calls for a conclusion and therefore it is incompetent.

"The Court: He may answer.

"A. Yes, sir, I think he probably would have died just the same whether he would have been operated at all."

All of this uncontradicted testimony shows that we have here a condition of "infirmity of body" as understood in the common speech of men. A condition where an ordinary coughing spell may cause an embolus and death is the sort of thing for which the company declined to furnish the deceased with double indemnity.

This is the case of "a morbid or abnormal condition of such quality or degree that in its natural and probable develop-

"Q. But it is a bodily infirmity? A. Yes, it is."

ment it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity," referred to by Cardozo, C. J., in Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914, 915.

In that case, death caused in part by the rupturing of a benign ulcer was held covered by the policy only because the benign ulcer could not be characterized as a disease or an infirmity. In the Browning case, 94 Utah 532, 72 P.2d 1060, Id., 94 Utah, 570, 80 P.2d 348, 350, the determination was on a finding, 80 P.2d page 353, that there was no evidence that the insured was suffering from "disease, bodily infirmity or bacterial infection". In these cases, as in the Rauert case, supra, it is clear that had the finding been otherwise, a different result would have been required. But in the case now before us the policy expressly excludes cases of death, "directly or indirectly, from infirmity of mind or body," and the only evidence is that the death resulted from a condition described by competent medical authority as "bodily infirmity".

As for the statement that "the insured did not die of thrombosis, but of embolism. A thrombus and an embolus are not the same thing," I cannot see anything in it. Since, as shown hereafter, the insured's doctor testified that he died from embolism, caused by the thrombosis, the distinction sought to be made is without a legal difference,—it is a mere exercise in semantics, emphasizing the effect rather than the cause.

"When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." Tapper v. Idaho Irr. Co., 36 Idaho 78, 210 P. 591. The facts here come so squarely within the terms of the excluding clause, that I think it is not permitted to us to write a new contract for the parties under the guise of applying a rule of "strict construction" to language that is perfectly plain.

And where a plaintiff's own evidence discloses a complete defense, the fact that the defense is an affirmative one, with burden of proof on defendant, is immaterial.

Draper v. City of Burley, 53 Idaho 530, 26 P.2d 128.

Plaintiff's own medical testimony was that the patient was given a sedative. This caused him to go to sleep. Then he snored, the snoring causing the coughing and heavy breathing which broke loose the embolus. Dr. Call testified: "The cause of the death was acute embolism, pulmonary embolism which was caused by violent action to break the embolism from the thrombosis." Dr. Brothers testified:

"Q. Do you mean to say, Doctor, that in your opinion Harry Wilson would have died at five o'clock in the morning April 8, 1947, whether there had been any operation or not? A. He might have.

"Q. It is your opinion that he would? A. I think he would.

"Q. From what do you think he would have died? A. Embolism.

"Q. What would have caused it? A. Thrombosis.

"Q. When did he have thrombosis? A. I think he had it before this operation."

That the thrombosis was the active and efficient cause of the death is thus made apparent. The hypodermic administration of a sedative was merely the occasion which started the snoring,—it was merely an incidental cause. In any event, the efficient, active cause of death was the bodily infirmity.

In the face of the clear, explicit, uncontradicted medical testimony just quoted, I think it cannot be said, as does the majority, that the Idaho court "would regard the untoward mishap in this instance as the inducing and sole proximate cause of the loss." I think the Idaho court would stick to the facts as the doctors related them. Courts are not wont to set themselves up as empowered to reverse the findings of qualified medical experts.

The Idaho case of O'Neil v. New York Life Ins. Co., 65 Idaho 722, 152 P.2d 707, has no resemblance to any of the facts here. I do not know why it should be cited in the court's opinion unless it be in support of the notion that no matter what

restrictive or excluding language is written into a contract of insurance, the Supreme Court of Idaho will, by a process of "strict construction", read it out of the policy. I think the Supreme Court of Idaho would be the first to repudiate any such suggestion, just as I think the time will come when that court will repudiate this court's rewriting of the parties' contract under the guise of "strict construction". It would not be the first time that has happened to this court. In Order of United Commercial Travelers v. Groves, 9 Cir., 130 F.2d 863, a case arising under Washington law, this court, although urged to do so, declined to note the distinctive language of an accident policy. In the later case of Evans v. Metropolitan Life Ins. Co., 26 Wash.2d 594, 174 P.2d 961, the Washington Supreme Court drew the distinction which this court had previously refused to consider, quoting at length from many cases, including First National Bank v. Equitable Life Assur. Soc., 225 Ala. 586, 144 So. 451, 454, in which it was said: "It seems, therefore, the great weight of authority supports the views expressed in our cases, viz. where there is special provision directing the attention of the insured to disease or bodily infirmity, and expressly excluding liability in case of death resulting directly or indirectly therefrom, some effect must be given to such provision."

What the Washington court held is stated in its quotation from Budzinski v. Metropolitan Life Ins. Co., 287 Mich. 495, 283 N.W. 662, 286 N.W. 842, as follows:

"The court will not make a new contract for parties under the guise of a construction of the contract, when in doing so it will ignore the plain meaning of words. * * *

"From my examination of clause two of the policies, I am constrained to hold that there is no liability in the instant cases as bodily infirmity or disease was a contributing cause of the assured's death. The policies are unambiguous and admit of no other construction." [26 Wash.2d 594, 174 P.2d 978]

In construing contracts generally, the Idaho court has many times used almost identical language concerning the unambiguous terms of written contracts. Thus, in Weed v. Idaho Copper Co., 51 Idaho 737, 10 P.2d 613, 619, the court said: "The contract is to be given effect according to its clear and unambiguous terms, and this court may not substitute or write a new contract for the parties." I think, therefore, that whenever it gets a case like this before it, it will make this decision another orphan like that in Order of United Commercial Travelers, supra.

It is inconceivable to me that the Idaho court would hold otherwise, in view of the plain implications of its decision in the Rauert case, supra.

I think the judgment should be reversed.