387 P.2d 598

**Ralph J. COBURN and Bertha Lee Coburn, husband and wife, Plaintiffs-Respondents,**

**v.**

**FIREMAN'S FUND INSURANCE COM-PANY, a foreign corporation, Defendant-Appellant.**

**No. 9376.**

Supreme Court of Idaho.

Dec. 19, 1963.

Holden, Holden & Kidwell, Idaho Falls, for appellant.

Black & Black, Pocatello, for respondents.

SMITH, Justice.

Appellant (defendant) has appealed from a judgment of $10,908 rendered in favor of respondents (plaintiffs) by the district court of Butte County. The judgment was the result of an action brought by respondents for recovery of the value of their three-fourths interest in a stored crop of potatoes destroyed by fire, allegedly insured by a fire insurance policy issued by appellant. The potatoes were grown by respondents as tenants of O. T. and Ruby I. Jones, who retained the remaining one-fourth interest in the crop.

Appellant, by answer and related instruments, admitted its issuance of the fire insurance policy, but resisted respondents' claim on grounds that they were not named as insureds in the policy, and could not claim benefits arising thereunder. We shall briefly relate the facts.

The harvested crop consisted of approximately 7,000 sacks of potatoes valued at $15,000 which were stored in lessor O. T. Jones's potato cellar near Arco. November 2, 1960, Jones applied to H. Michael Porter, in his capacity as appellant's insurance agent in Arco (and who also was executive vice-president of Butte County Bank), for a $15,000 policy of fire insurance covering the stored potatoes. Mr. Porter, in his agency capacity, thereupon issued appellant's fire insurance policy in the name of O. T. Jones for $15,000 insuring the entire stock of stored potatoes against loss by fire. Jones paid the policy premium, respondents agreeing to reimburse Jones three-fourths of such amount.

Loss of the stored potatoes by fire occurred December 31, 1960. On that date Jones submitted a statement of loss showing $14,544.00 as the inventory value of the potatoes. Jones showed "insured's interest" (one-fourth) to be the value of $3,636.00 which appellant paid and obtained his written release.

Thereafter, respondents submitted a sworn written statement of proof of loss, dated March 1, 1961, to appellant. Therein respondents recited that Jones owned an undivided one-fourth interest in the destroyed potatoes; and that they, respondents, owned the remaining undivided three-fourths interest of the value of $10,908, less approximately $1,000 which respondents owed to Jones, which he had advanced for expenses attendant to growing and harvesting the crop. Respondents, in their claim, alleged that they were bailors and beneficiaries of such three-fourths interest in the stock of potatoes, and which had been stored in the cellar of O. T. Jones, as bailee and trustee thereof. They referred to and submitted a copy of the written lease under which Jones leased to respondents the land upon which the potatoes were grown, and alleged that appellant's agent, H. Michael Porter, was fully informed of respondents' interest as owners of their portion of the potatoes covered by the insurance policy; that Jones, as bailee, had exclusive possession of the cellar and the stock of potatoes stored therein, including the three-fourths interest owned by respondents, and that the debt which respondents owed to Jones was to be paid out of respondents' interest in the potatoes when sold.

Appellant rejected respondents' claim, whereupon respondents commenced this action.

Respondents in their complaint alleged (1) that on November 2, 1960, Jones made

application to H. Michael Porter, appellant's authorized insurance agent, for a policy of insurance on behalf of himself and respondents, insuring the stored crop of potatoes against fire loss; (2) that appellant issued the policy (in the name of O. T. Jones) covering the stock of potatoes in the amount of $15,000; (3) that appellant's agent well knew of the respective interests of respondents, on the one hand, and of O. T. and Ruby I. Jones, on the other hand, and well knew that the Jones's interest was but one-fourth of the total stored crop insured at $15,000; that appellant accepted premiums on the basis of insurance covering the combined interests of respondents and Jones, but that the agent "carelessly and negligently, or wilfully and fraudulently" failed or neglected to include respondents as insureds under the policy. Additionally respondents alleged (4) that the Joneses were bailees in sole control of the stored potato crop, and that because of that existent bailor-bailee relationship and because of the debt which respondent owed them, that the Joneses had "a substantial insurable interest in the entire stock of potatoes" which would enable them to insure the entire interests,—both their own and that of respondents.

The cause was tried and submitted to the trial court sitting without a jury. The court found that O. T. Jones was not a bailee, nor in sole control of the stock of potatoes; also, that appellant's agent, Mr.

Porter, had no specific knowledge of respondents' interest in the potatoes. It then concluded:

"That O. T. Jones had such an insurable interest in the stock of potatoes in its entirety as to allow Mr. Jones to insure plaintiffs' [respondents'] interest as well as his own."

In support of such conclusion the court further concluded that appellant intended to insure the entire stock of potatoes; that full disclosure of the insurable quantity of the potatoes was made to appellant, and that appellant accepted an insurance premium based on the entire stock of potatoes with full knowledge as to what it was insuring; that appellant's liability was not enlarged nor altered by a disclosure of respondents' interest in the potatoes, from that liability which appellant contemplated and assumed at the time of its acceptance of the insurance premium; and that appellant did not tender to O. T. Jones the unearned premium, or the amount of his insurable interest in the entire stock of potatoes, or any sum other than one-fourth of the actual cash value of the stock of potatoes destroyed by fire.

Appellant's assignments of error attack the findings of the trial court to the effect that O. T. Jones purchased the insurance for himself and respondents; also, to the effect that the insurance policy covered the interests in the potatoes of both Jones and

of respondents, rather than only the interest of Jones, appellant contending that the policy protected only Jones as named insured.

Appellant contends that Jones did not have an insurable interest in the entire stock of potatoes, but only to the extent of his one-fourth interest plus the debt of $1,000 owed to him by respondents. In support of such contention appellant refers to I.C. § 41–1806(3) enacted Sess.Laws '61, ch. 330, § 398, p. 645, reading: "The measure of an insurable interest in property is the extent to which the insured might be directly damnified by loss, injury, or impairment thereof." Inasmuch as the legislature adopted such enactment in 1961, after the issuance of the insurance policy and occurrence of the loss involved in this cause in 1960, and since the enactment constitutes substantive law, we cannot accord unto it a retroactive effect. Idaho Const., Art. 11, § 12; Rogers v. Hawley, 19 Idaho 751, 115 P. 687.

Appellant nevertheless argues that the 1961 enactment, I.C. § 41–1806(3), is but a declaration of the then existing law to the effect as provided in the enactment, citing Miller v. World Insurance Co., 76 Idaho 355, 283 P.2d 581, and 5 Appleman Ins. Law and Practice, § 3361, p. 497. The Miller case ruled in effect that a court cannot by construction create liability not assumed by the insurer, nor make a new contract for the parties or one different from that plainly intended; nor may it add words to the insurance contract either to create or avoid liability; and Appleman recognizes those basic rules. Implicit in both authorities is the principle that the insurance extends to the liability assumed by the insurer and encompasses the interest of the insured.

3 Couch, Insurance, § 24.13 (2d Ed. Anderson 1960), sets forth a widely accepted definition of an insurable interest, at page 86:

"* * * a person has an insurable interest in property whenever he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction. If he would sustain such loss, it is immaterial whether he has, or has not, any title in, or lien upon, or possession of, the property itself. Any right which may be enforced against the property, and which is so connected with it that its injury or destruction will cause loss, is an insurable interest therein. Any interest in property, legal or equitable, qualified, conditional, contingent, or absolute, or merely the right to use the property, with or without the payment of rent, is sufficient."

As to the extent of an insurable interest, the same author states:

"The law does not seek to evaluate the extent of the insurable interest. It therefore is immaterial that the interest of the insured is overvalued as long as the actual interest is substantial in relation to the amount of the insurance." Supra, § 24.2 at p. 67.

Generally accepted precepts support the proposition that the insurable interest of O. T. Jones in the stock of potatoes was a substantial one in relation to the amount of the insurance coverage; and not so grossly disproportionate to the face amount of the policy as to render it a wagering device which the courts will not allow on grounds of public policy. Nelson v. New Hampshire Fire Insurance Company, 263 F.2d 586 (9th Cir. 1959); 44 C.J.S. Insurance § 175 (1945).

A portion of the annotation cited by appellant in 68 A.L.R., p. 1344, deals with the extent of recovery by an insured who has only a partial or limited interest in the insured property. In the instant case, however, the rights of an undisclosed third party must be determined. It is interesting to note two theories with which the annotation deals, i. e., agency and estoppel, which allow the named insured to recover the full amount of the policy. In dealing with the theory of agency for an undisclosed principal, the author's summarizing statement appears as follows:

"* * * there is a class of cases in which the insured who has merely a qualified interest in the property, and who insures the property to the extent of its full value, is acting merely as agent of the real owner, expressly, impliedly, or merely as an agent for an undisclosed principal. * * * suffice it to say that in all such cases the agent with limited interest acting for the principal may insure the property to its full value, and in case of loss recover the full value, to hold the excess over his interest in trust for the real owner. (Citations)." Supra at 1348.

In discussing cases which allow full recovery on the basis of estoppel, the author continues.

"Some cases which allow full recovery to the qualified owner base their holding upon elements of estoppel on the part of the insurer, as where the insurer, with full knowledge of the nature of the insured's interest, insures the property for its full value and charges premiums accordingly. (Citation)." Supra at p. 1351.

The support accorded the two theories shows that the undisclosed third party's rights are not substantially different from those of the named insured. Beginning with Justice Rossman's learned opinion in Miller v. Gold Beach Packing Co., 131 Or. 302, 282 P. 764, 66 A.L.R. 858 (1929), to the effect that a remainderman is not entitled to any interest in insurance proceeds

paid to a tenant under an insurance policy by him procured, *in the absence of an agreement between the two that he should obtain the protection for both,* we observe the identical rule applied in the case of lessors and lessees in Alexander v. Security-First Nat. Bank of Los Angeles, 7 Cal.2d 718, 62 P.2d 735 (1936). While both opinions took the position that such general rule would not apply where there was a special provision in the lease calling for joint insurance protection, that exception has been broadened in California and other jurisdictions, to the end that where equitable considerations are present, the rights of others, having an interest in the property covered by the insurance, are protected. The recent case of Russell v. Williams, 58 Cal.2d 487, 24 Cal.Rptr. 859, 374 P.2d 827 (1962), is in point. After stating the general rule, the Supreme Court of California stated:

"There are instances where, because of contractual provisions or equitable considerations, the insured holds the proceeds of a fire insurance policy in trust for or otherwise subject to the claim of others who have an interest in the property covered by the subject policy." Supra at p. 861 of 24 Cal. Rptr. at p. 829 of 374 P.2d.

Although the court in the Russell case was referring only to the rights of the named insured, substantially the same statement therein contained relating to the rights of a third party are found in Lynch v. Johnson, 196 Va. 516, 84 S.E.2d 419 (1954):

"Hence, it may be said generally, if any person insure his own interest in property in his own right and at his own expense, then he is entitled to the insurance proceeds and the owner of any other interest in that property has no claim to such proceeds; and if the insurance so procured exceeds the value of the insured's insurable interest, then the excess is of no concern to any other person who also has an interest in the property, but is a question exclusively between the insured and the insurer. On the other hand, if any person own an insurable interest in property which is insured for his benefit under any agreement or obligation by some other person, then such owner has an enforceable claim against the proceeds of that insurance. When the persons for whose benefit insurance is secured are not named, or are imperfectly or improperly named in the policy, the identity of such persons may be shown by extrinsic evidence. Morotock Ins. Co. v. Cheek, 93 Va. 8, 24 S.E. 464; Boyd v. McKee, 99 Va. 72, 37 S.E. 810; 29 Am.Jur., Insurance, § 205, p. 214; Law of Ev., Va. and W. Va., (Michie, 1954), § 246." Supra 84 S.E.2d p. 423.

In the light of the foregoing authorities, we must now ascertain whether the evidence is sufficient to sustain the findings of the trial court, and particularly, the finding that Jones acted for himself as well as on behalf of respondents when he applied for the insurance, and caused his and respondents' interests in the stock of potatoes to be insured.

The farm lease required respondents to pay the major portion of the expenses attendant to producing the crop of potatoes. Before borrowing money from Jones, respondent Ralph J. Coburn, during July 1960, talked with Mr. Porter at the bank about a loan; at that time Mrs. Coburn and Mr. Jones were also present. Respondent, Mr. Coburn testified:

"A. * * * I asked Mr. Porter could I borrow some money. I told him approximately eleven hundred dollars, * * * and that I wanted to pay Mr. Jones some money I owed him for some phosphate, and Mr. Jones told him he would sign one-fourth of his spuds, and I told him I would sign three-fourths of mine, if we could get the note.

"Q. What spuds are you talking about?

"A. Mine and O. T. Jones' potatoes that we raised on O. T. Jones' place."

Mrs. Coburn's testimony shows that she and her husband indicated to Mr. Porter the property upon which they were raising the potatoes. Mr. Porter would not authorize such a loan by the bank even though both respondents and Mr. Jones indicated their willingness to "co-sign" a note and encumber the entire potato crop to secure such a loan.

At the time of the transactions involved in this action Mr. Porter had been in the banking business at Arco seventeen years with the Butte County Bank and was its executive vice-president. In addition he conducted an insurance business. He stated that he had been insuring Jones's properties for ten or twelve years. He had known respondents for about ten years but had not written insurance for them.

Mr. Porter then testified to the effect that he did not know what property respondents were farming during 1960 but likely knew they were farming; and that he had no recollection why he had refused a loan to respondents during July 1960, other than that they had not established credit with the bank.

About two weeks prior to the time the insurance was obtained (on November 2, 1960) a small fire occurred in the potato cellar. Mr. Jones thereupon had the electric wiring repaired. As a result of that occurrence Jones and respondent Coburn talked about insuring their potatoes. Mr. Jones stated, "we spoke about it would be a good thing—it might be well if we insured

it [their stock of potatoes]." Mr. Coburn also testified, after he and Mr. Jones had conferred, that "Mr. Jones and I were going to take out insurance * * * on the potatoes in our cellar."

On November 2, 1960, just after Mr. Jones had obtained the insurance coverage on the potatoes through Mr. Porter at the bank, Mr. Coburn met Mr. Jones at the front of the bank building, placing the time "about one minute after he put the insurance on the potatoes." Jones stated he had obtained the insurance covering all the potatoes. Mr. Coburn's further testimony appears:

"Q. And what was said regarding insurance at that time?

\* \* \*

"A. He says 'Ralph, I insured our potatoes today,' and I said 'Well, that is sure good, but I don't have no money for you right now.' He said 'Fine enough; pay me when you get it.' "

Mr. Porter testified that the policy was written in the name of O. T. Jones for a coverage of $15,000, upon the estimated amount of potatoes involved at an estimated value per sack. He testified that he did not know of respondents' claimed interest in the potatoes until after the fire occurred; that Jones had not advised him of respondents' interest in the potatoes.

Mr. Jones testified that he told Mr. Porter how many potatoes were in the cellar, about 6,000 bags worth about $2.50 a bag, and that subsequently appellant's policy was issued through Mr. Porter, the agent. Mr. Jones's further testimony appears:

"Q. And these seven thousand sacks which it mentions here, or the six thousand, as you recall it, * * * That was all of the potatoes in this potato cellar?

"A. That is right. * * *

"Q. And that included Mr. Coburn's share as well as yours?

"A. Yes, it was all of the potatoes there was in there.

\* \* \*

"THE COURT: * * * Was it your intention to insure all of the potatoes, Mr. Jones, * * * ?

"A. Well, I just insured all the potatoes; that is all there was to it.

"Q. * * * And did you subsequently bill Mr. Coburn for three-fourths of the premium? A. Yes, sir."

Mr. Jones also stated that at the time he applied for the insurance, "I just told Mike [Mr. Porter] I wanted to insure the potatoes. I didn't say,—there wasn't anything said at that time whether they were mine, or Coburn's or whose they were. I just wanted to insure the potatoes, and Mike said 'All right,' and that was it." He also re-

lated the incident about meeting Mr. Coburn right after the potatoes had been insured and advising him that he, Jones, had insured all the potatoes.

Respondent Coburn on cross examination further testified to the effect that he checked the policy which Mr. Jones obtained and recognized the clause which counsel read to him, that it, the policy, "insures the named insured to the extent of the actual cash value of the property"; that he determined from the policy that it insured "approximately six thousand sacks, fifteen thousand dollars" and that it had "every spud in the cellar insured, and that was good enough for me." Elsewhere he was asked, "And was it your understanding your share of the potatoes had been insured?" to which he answered, "Yes, sir. I figured they were."

The testimony mentioned while conflicting in certain respects is substantial and supports the trial court's finding that O. T. Jones acted as agent on behalf of both himself and respondents when he applied for the fire insurance, in culmination of their understanding and agreement to insure their combined interests in the stored potatoes. Sumner v. Flowers, 130 Cal.App. 2d 672, 279 P.2d 772 (1955), quoting from Ford v. Williams, 21 How. 287, 289, 16 L. Ed. 36, 38, stated the rule announced by the United States Supreme Court as follows:

"'The contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein, and notwithstanding the rule of law that an agreement reduced to writing may not be contradicted or varied by parol, it is well settled that the principal may show that the agent who made the contract in his own name was acting for him. This proof does not contradict the writing; it only explains the transaction.' This declares the universal law." Supra 279 P.2d at 774.

See also Wood Building Corporation v. Griffiths, 164 Cal.App.2d 559, 330 P.2d 847; Miller v. Ziedrich, 199 Or. 505, 263 P.2d 611; Baker Oil Tools v. Chism, 70 Wyo. 461, 251 P.2d 569; 3 C.J.S. Agency § 276; 2 Am.Jur., Agency, §§ 392 et seq.; Annotation 68 A.L.R. 1344, relating to the extent of recovery by an insured who has only a partial or limited interest in the insurance policy, and particularly § III thereof commencing at page 1347.

The findings and judgment of the trial court will not be disturbed on appeal where supported by substantial and competent, though conflicting, evidence. I.C. § 13-219; Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788; Molstead v. Reliance National Life Insurance Co., 83 Idaho 458, 364 P.2d 883; Zollinger v. Big Lost River Irrigation District, 83 Idaho 411, 364 P.2d

176; Thompson Lumber Co. v. Cozier Container Corporation, 80 Idaho 455, 333 P.2d 1004.

■ Appellant assigns error of the trial court in awarding an attorney's fee to respondents, and particularly, that the court abused its discretion in awarding an attorney fee in the sum of $3,000.

I.C. § 41–1403 enacted by the 1951 legislature, reenacted by the 1961 legislature and now I.C. § 41–1839 in part provides that upon failure to pay to the person entitled the amount justly due under an insurance policy, the surety "shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, * * * pay such further amount as the court shall adjudge reasonable as attorney's fees in such action."

The parties stipulated, should the court find for respondents and that they were entitled to an attorney's fee, that the court may fix a reasonable attorney's fee without proof. Pursuant thereto, after having fixed respondents' insured loss at $10,908, the court found that respondents were entitled to $3,000 as a reasonable attorney fee, and caused judgment to be entered accordingly.

After examining the record carefully, considering the services of counsel, the nature of the litigation and the amount involved, and in the light of our further holding hereinafter set out, we conclude that the trial court did not abuse its discretion in awarding such attorney fee to respondents. Butterfield v. Western Casualty & Surety Co., 83 Idaho 79, 357 P.2d 944.

■ Respondents' counsel have filed in this Court their motion for an award against appellant of an additional reasonable attorney's fee for services rendered on behalf of respondents on this appeal in defending the judgment in their favor. Molstead v. Reliance National Life Insurance Co., 83 Idaho 458, 364 P.2d 883. We are constrained to the view that $600 is a reasonable additional attorney fee to be awarded and the same hereby is awarded respondents for the services rendered by their counsel on this appeal. In finding such amount we take cognizance of the amount awarded by the trial court.

The judgment of the trial court is affirmed. Upon remittitur however the trial court is directed to increase the judgment by the amount of $600 attorney's fee awarded in favor of respondents on this appeal.

Costs to respondents.

KNUDSON, C. J., and McQUADE, McFADDEN and TAYLOR, JJ., concur.