444 P.2d 38

James T. SHIELDS, Maude Shields, James H. Shields and Jane Shields Redman, a Partnership dba "Shields", Third-Party Plaintiffs and Respondents,

v.

HIRAM C. GARDNER, INC., a Corporation, as Attorney-in-Fact for Manufacturers and Wholesalers Indemnity Exchange, Third-Party Defendants, and Appellant.

No. 9956.

Supreme Court of Idaho.

July 26, 1968.

Benoit, Benoit & Alexander, Twin Falls, for appellant.

Hepworth, Nungester & Felton, Buhl, for appellee.

SPEAR, Justice.

Plaintiffs-respondents, the insureds, will be referred to as Shields, and defendant-appellant, the insurer, as Manufacturers.

Shields, a partnership, was sued by certain residents of Mexico and a Mexican corporation seeking judgment for damages occasioned by failure to germinate of certain seed beans purchased from Shields. Shields brought this third party action against Manufacturers to force it to defend and to pay any judgments within the policy limits of its insurance policy issued to Shields. Summary judgment was entered in favor of Shields, and Manufacturers has appealed.

The undisputed facts show that one Coughran, with other Mexican residents, placed by telephone from Mexico, an order with Shields at Buhl, Idaho, for a quantity of seed beans, of which Shields is a processor and dealer. The seed beans, ordered on January 5, 1965, were shipped by Shields to Nogales, Arizona, where payment was made by a bank on behalf of the Mexican residents and delivery of the beans made to them in Arizona. The seed beans were taken into Mexico and planted, but failed to germinate properly, with resulting loss. The loss suffered resulted from the loss of a crop, or the use of the land. The damages were aggravated by the fact that the plaintiffs could not reseed for a period of three to four weeks because of a Mexican governmental regulation concerning permits. The Mexican residents instituted suit against Shields and others for their damages. The seed beans had been treated by Shields at their Buhl plant with a chemical that had destroyed their viability because of an error in mechanical mixture.

Shields had an insurance policy issued by Manufacturers for the period of September 1, 1964, to September 1, 1965, denominated as a "Blanket Liability Policy." Shields contends this policy required Manufacturers to defend the action brought by the Mexican residents, and to pay, within the policy limits, any judgment obtained. Manufacturers, on the other hand, asserts that this transaction was not within the terms of the policy and hence it is not liable thereunder.

Shields, on this appeal, asserts the trial court correctly granted the summary judgment primarily on two theories: first, because the provisions of the policy protect Shields from the liability claimed in the action by the purchasers of seed beans; and secondly, that the record discloses Manufacturers had waived certain policy provisions or was estopped to deny coverage. Manufacturers contends, however, that the only basis under which the summary judgment could be upheld is on the theory that construction of the policy does not involve resolutions of factual issues; Manufacturers claims, however, that there are genuine issues of material fact which are unresolved as to the estoppel or waiver theory advanced by Shields and therefore the judgment was improperly entered.

The trial court in its summary judgment held that Manufacturers is obligated under the terms of the insurance policy to defend Shields in the main action; that Shields have the protection of the policy limits and that Manufacturers was liable for attorney fees and costs Shields incurred in defend-

ing the main action and also in prosecuting this third party action.

Pertinent provisions of the printed portion of Manufacturers' "Blanket Liability Policy" include the following:

"PART I LIABILITY INSURING AGREEMENTS

"1.  Coverage A—Bodily Injury Liability

\* \* \*

Coverage B—Property Damage Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof.

\* \* \*

EXCLUSIONS—PART I

This policy does not apply:

(a)  to liability assumed by the insured under any contract or agreement except (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

\* \* \*

(f)  as respects the insurance which is afforded for other than automobile under coverage B, to injury to or destruction of \* \* \* (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the occurrence arises.

SPECIAL CONDITIONS APPLICABLE ONLY TO PART I

1.  Definitions

\* \* \*

(g)  Products Hazard.  The term 'products hazard' means

(1)  goods or products manufacturered, sold, handled or distributed by the named insured or by others trading under his name, if the occurrence arises after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such occurrence arises away from the premises owned, rented or controlled by the named insured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented or located for use of others but not sold;

(2)  operations, if the occurrence arises after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured and (c) the existence of tools, uninstalled equipment and abandoned or unused materials.

\*    \*    \*    \*    \*    \*

GENERAL CONDITIONS— PARTS I AND II

16.  Policy Period, Territory

This policy applies only to occurrences which arise during the policy period within the United States of America, its territories or possessions, or Canada.

\* \* \*."

General Change Endorsement No. 1, which is a typewritten endorsement later added to

the printed portion of the policy, provides in pertinent part:

*"PROVISION NUMBER II*

Insofar as Seeds are concerned, it is further understood and agreed that the word, 'accident' shall be substituted for the word 'occurrence' wherever used with respect to coverages afforded for 'Property Damage Liability—Losses resulting from Products as afforded hereunder.

"It is further understood and agreed that the definition of Products insofar as Seeds are concerned is amended to include the following: 'To Protect the Insured against liability imposed by the erroneous delivery of seeds, errors in mechanical mixtures, cross-pollination, germination failure, or the presence of noxious weed seed.' "

In summary the policy is a standard liability policy. It is broken down into two parts. Part I contains the liability insuring agreements, to which there are certain exclusions applicable solely to Part I, as well as special conditions applicable only to Part I. Part II insures against automobile physical damage, and to which there are certain exclusions and special conditions. Part II of the policy is not in issue here.

Part I, the liability insuring agreement, is divided into two coverages. Coverage A insures against bodily injury liability, which is not before the court. Coverage B, of which we are primarily concerned, insures against property damage liability. The exclusionary provision applicable to Part I (the liability insuring agreement) states: "'This policy does not apply: (a) to liability assumed by the insured under any contract * * * except (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazards as defined, a warranty of goods, or products." Other exclusionary provisions hereunder are not applicable herein. Exclusion (f) (4) excludes coverages for injury to or destruction of goods or products sold, handled or distributed by the insured.

Certain special conditions are made applicable to Part I of the policy, including a definition of terms. Under these special conditions applicable to Part I is the definition of the "Products Hazard" quoted above, (g) (1) and (2), supra. It is to be noted that this term is defined to include damages caused by goods handled by the insured if the "occurrence arises after possession * * * has been relinquished and if such occurrence arises away from premises * * *" of the insured.

Both Part I [Liability Insuring Agreement] and Part II [Automobile Physical Damage Insuring Agreements] are by the printed terms of the policy made subject to the various General Conditions of the policy which include conditions as to other insurance, premium, inspection and audit, assistance and cooperation of the insured, subrogation, etc., and also paragraph 16, which is set out verbatim hereinbefore, and makes the policy applicable only to "occurrences which arise during the policy period within the United States * * *."

On rehearing, this court is called upon to consider whether General Change Endorsement No. 1 constitutes an additional insuring agreement, which, by its terms, is intended to provide coverage for specified named perils irrespective of the place of "occurrence" which appellant contends must be construed to be the place of loss (Mexico), that is, the place where damages arose.

It must be emphasized that General Change Endorsement No. 1 is a *typewritten endorsement* attached to the main body of the printed policy and provides in pertinent part:

*"Provision Number II*

"Insofar as Seeds are concerned, it is further understood and agreed that the word 'accident' shall be substituted for the word 'occurrence' wherever used with respect to *coverages* afforded for 'Property Damage Liability—Losses resulting from *Products* as afforded hereunder.

"It is further understood and agreed that the *definition* of *Products* insofar as Seeds are concerned is amended to include the following: *'To Protect* the Insured against liability imposed by the er-

roneous delivery of seeds, errors in mechanical mixtures, cross-pollination, germination failure, or the presence of noxious weed seed.'" (Emphasis supplied)

The major thrust of this provision directs itself to coverage and protection: that insofar as seeds are concerned the word "accident" shall replace the word "occurrence" wherever used with respect to "coverages afforded for * * * Losses resulting from Products as afforded hereunder;" and immediately thereunder the definition of "Products" (as it relates to "coverages afforded for Losses resulting from Products") is amended to include protection for the insured "against liability imposed by * * * errors in mechanical mixtures."

■ Appellants contracted specifically "To Protect the Insured against liability imposed by * * * errors in mechanical mixtures." This interpretation is supported by the principle, long adhered to by this court, that contracts of insurance are to be construed in view of their general objects and strict, technical interpretation is to be avoided. Where language may be given two meanings, one of which permits recovery and the other does not, it is to be given the construction most favorable to the insured. Mayflower Ins. Exchange v. Kosteriva, 84 Idaho 25, 367 P.2d 572 (1961); Scharbach v. Continental Cas. Co., 83 Idaho 589, 366 P.2d 826 (1961); Penrose v. Commercial Travelers Ins. Co., 75 Idaho 524, 275 P.2d 969 (1954); O'Neil v. New York Life Ins. Co., 65 Idaho 722, 152 P.2d 707 (1944); Rauert v. Loyal Protective Ins. Co., 61 Idaho 677, 106 P.2d 1015 (1940); Watkins v. Federal Life Ins. Co., 54 Idaho 174, 29 P.2d 1007 (1934).

■ Stated somewhat differently, an insurance contract is to be construed most favorably to the insured and in such a manner as to provide full coverage of the indicated risks rather than to narrow protection. This court will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance.

■ After General Change Endorsement No. 1 was added specifically providing protection for certain named additional perils incidental to the insured's seed business, it is only reasonable to expect that coverage was afforded against the type of liability growing out of the particular circumstances of the transaction under consideration.

■ Where the insurer issues this kind of endorsement, he is presumed to know the nature of his insured's business and that it is one wherein liability may be imposed from erroneous mixtures in seed preparation. Normally, a businessman who takes out such a "Blanket Liability Policy" with express coverage for "liability imposed by * * * errors in mechanical mixtures" would expect this sort of transaction to be covered; for it was exactly that contingency (error) which has given rise to the principal action.

The reason the pinto bean seed involved failed to germinate is explained, without being refuted, in an affidavit of James T. Shields, one of the third party plaintiffs, contained in the transcript, the pertinent portion being:

"* * * The treatment applied to the bean seed was an insecticide-fungicide preparation manufactured by Morton Chemical Company, one of the parties to this suit and sold to us by C K Brown and Associates Inc a corporation. The chemical treatment applied to the seed beans is known by the trade name Penodrin A-13. The seed beans in question were treated with said chemical by means of a mechanical mixer which likewise was purchased through C K Brown and Associates Inc but manufactured by Morton Chemical Company and such chemical treater is known by the trade name of a Penogen treater.

"Affiant further states that if there was a failure of germination as contended by the plaintiffs in the above captioned case, it was by reason of the error in mechanical mixtures of said bean seed."

Admittedly, such an error as herein contemplated did (and could only) occur at the Shields plant in Buhl, Idaho.

■ Moreover, it is a matter of common knowledge that insurance contracts are not

entered into as other contracts generally are; the company fixes the terms and limits of the contract and must be held, in the absence of plain, unequivocal exceptions and provisions to the contrary, to intend what the insured party is likely to understand by its terms. Rauert v. Loyàl Protective Ins. Co., 61 Idaho 677, 106 P.2d 1015 (1940). As this court stated in the *Rauert* case, supra, 61 Idaho at pages 685-686, 106 P.2d at page 1018, quoting with approval from Browning v. Equitable Life Assur. Soc., 94 Utah 532, 72 P.2d 1060, 1073 (1937), and also quoted in O'Neil v. New York Life Ins. Co., 65 Idaho 722, 729-730, 152 P.2d 707, 710 (1944):

> " 'Insurance policies, while in the nature of written contracts, are not prepared after negotiations between the parties, to embrace the terms at which the parties have arrived in their negotiations. They are prepared beforehand by the insurer, and the company solicitors then sell the insurance idea to the applicant. Normally, the details and provisions of the policy are not discussed, except that the particular form of policy is best suited to give the applicant the protection he seeks. If he reads the policy he is generally not in a position to understand its details, terms, and meaning except that, in the event against which he seeks insurance, the company will pay the stipulated sums. He seldom sees the policy until it has been issued and is delivered to him. He signs an application blank in which the policy sought is described either by form number or by a general designation, pays his premium, and in due course thereafter receives, either from the agent or through the mails his policy. Many of its terms and all of its defenses and super-refinements he has never heard of and would not understand them if he read them. Such fact is evident from the fact that cases like this arise where lawyers and courts disagree as to what such provisions mean. In fact, there are about as many different constructions by the courts of terms such as those involved here as there are insurance companies issuing such policies. For this reason the rule of *strictissimi juris* has been applied almost universally to insurance contracts, and this jurisdiction, like many others, has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid.' "

█ In applying this principle to the facts at hand, it is well to note that we are construing the terms of an insurance policy which has been in effect, through repeated renewals, for over twenty-five years. Its various terms, conditions and endorsements require fifteen pages of the transcript lodged in this appeal. That it is ambiguous relative to the coverage afforded by its "General Change Endorsement No. 1" is amply illustrated by the fact that the members of this court have been almost equally divided on the proper interpretation thereof, both on the original hearing and after the rehearing.

To me it is abundantly clear that the liability of respondents which was caused by the error in mechanical mixtures is precisely the protection against which the appellant insured the respondents in the General Change Endorsement No. 1, and particularly under the principle of law of *Watkins*, *Rauert*, *O'Neil*, *Penrose*, and *Scharbach*, supra.

Additionally, the record discloses that the executive vice-president of Manufacturers recognized that this was the intent of the parties, for in a letter replying to an inquiry by James H. Shields, one of the respondents, John G. DeVore, replied in part as follows:

"Also, Mr. Shields, we should have no problems differentiating between 'occurrence' and 'accident'. Your policy at M & W reads occurrence throughout except for property damage liability applicable to *seed* products. For seeds only, the policy is changed to cover named perils (erroneous delivery, mechanical mixture, cross pollination, non-germination and noxious weeds) or, if otherwise, seed product losses caused by accident."

It is to be noted that this executive vice-president recognized that the policy had been *changed to cover certain named perils* which included liability for damages resulting from mechanical mixture. This is exactly what occurred and, as pointed out hereinbefore, this occurrence was at Buhl, Idaho. Therefore, it is not within the exclusionary provisions concerning the territorial condition of the policy contained in General Condition No. 16.

As further supporting the interpretation that this type of occurrence was afforded coverage by General Change Endorsement No. 1, we quote from an October 23, 1961 letter from James H. Shields to Manufacturers, in which he advised the latter as follows:

> "To sum up, what we mean by 'all liability' protection is to be ready when the big one comes along and one thing we want to do is to be sure as we possibly can be that we are covered and covered properly when and if this ever happens. We are not able to read these insurance policies fine print and the writers opinion is that one never knows until the thing is taken into court and then the interpretation is sometimes rather dubious but what we want is coverage for the big deal even if we have to pay more for it and we know that you must understand the risk that is attached and will undoubtedly, in all cases, keep yourself protected by spreading the coverage through other concerns. We realize that this is a mutual set-up and one takes some risk when they operate under a concern of this kind and it all depends on the ability and integrity of the people that are running it. As stated before, we don't mind the cost but we want the coverage, without a lot of 'whereas's' and 'wherefores'."

There is no question but what this loss for which respondents were sued in the original cause of action for loss of crops was "the big one," because the prayer demanded reimbursement for damages allegedly suffered in the sum of $301,890.77 together with costs of suit.

Manufacturers should be held responsible for any and all liabilities, within the policy limits, incurred by respondents to the plaintiffs in the original cause of action together with respondents' attorney fees and court costs as set out in the amended summary judgment, which is affirmed.

As previously noted herein, appellants also contend error by the trial court because there are disputed questions of fact, i. e., whether appellants had waived or were estopped to deny coverage under the terms of the policy. This contention is without merit, for the motion for summary judgment by respondents was made entirely on the grounds that appellants were obligated under the terms of the policy to defend Shields in the original cause and that respondents would have the protection, within the policy limits, for any liability imposed upon them as the result of such cause of action; and thirdly, that they were entitled to attorney fees and costs incurred in defending the original suit and prosecuting their third party claim against appellants. In neither the original nor the amended judgment did the trial court so much as even mention the theories of waiver or estoppel. The summary judgment is based wholly and entirely upon the grounds urged in the motion and to remand this cause to the trial court for a hearing on *issues of fact* raised by these theories would constitute error on the part of this court.

Judgment affirmed with costs to respondents, including attorney fees in the sum of $3,250.00 in accordance with stipulation entered into by the parties that in event· respondent should prevail a reasonable attorney fee would be in this sum. I. C. § 41-1839; Heath v. Utah Home Fire Ins. Co., 89 Idaho 490, 406 P.2d 341 (1965); Halliday v. Farmers Ins. Exchange, 89 Idaho 293, 404 P.2d 634 (1965); Coburn v. Fireman's Fund Ins. Co., 86 Idaho 415, 387 P.2d 598 (1963).

TAYLOR and McQUADE, JJ., concur.

McFADDEN, Justice (dissenting).

The majority opinion is to the effect that under the typewritten General Change En-

dorsement No. 1, appellant insured respondent from all losses arising out of "erroneous delivery of seeds, errors in mechanical mixtures, * * * germination failure, * *," and that an error in mechanical mixture took place at Buhl, Idaho; and hence appellant was obligated to defend the action against Shields and pay all damages and costs of defense. The basis for such conclusion can be summarized as follows: that the General Change Endorsement No. 1 is typewritten; it is ambiguous, and hence must be construed against appellant. Moreover, to buttress this conclusion, the majority opinion quotes from a letter dated September 27, 1961, from Mr. DeVore, executive vice president of Manufacturers, appellant company, addressed to Mr. Shields, recognizing that the policy had been changed to cover certain named perils. The majority opinion then quotes from the contents of a letter of Shields to Manufacturers, dated October 23, 1961, wherein Shields wanted to be assured he was covered when the "big one comes along."

I cannot agree with the conclusion reached by the majority opinion. The policy in question is a standard "blanket liability policy." Various courts have considered such policies in numerous cases as hereinafter pointed out. Almost unanimously the courts have considered that there are two elements requisite for liability to be imposed upon an insurer under such a policy, and those elements are: (1) that the insured must be at fault, i. e., because of negligence, breach of warranty, etc., and (2) that as a result of such fault a third party suffered damages. Those cases have recognized that the focal point in determining if there is or is not coverage under such a policy is the time and place where the damages were sustained.

In the instant case, the majority opinion uproots the gravamen of the action from the time and place of the "accident" or "occurrence" which culminated in the loss to the third party, to the time and place where the insured (Shields, in this instance) committed the fault or error which was the causative factor of the loss to the third party. The majority opinion accomplishes this shift of the gravamen without citation of authority. The effect of such holding will place in doubt the validity of other liability policies in this state which afford protection for "products hazard" liability.

As later discussed herein, almost without exception, cases from other jurisdictions have recognized that the time and place where the damages arise is the controlling factor in determining whether a particular liability policy affords coverage to the insured for the damages and not the time the insured's actions or negligence took place. Established, recognized principles of law are being disregarded by the majority opinion in this regard.

It is fundamental that for liability of an individual to arise in the field of tort law, it is essential that the alleged tortfeasor be negligent, or commit an act which, under recognized principles of causation, *results in injury or damage to another*. 2 Harper and James, The Law of Torts, § 25.1 (1956) states:

"The substantive law applicable in this field [torts] makes actual damage a prerequisite to plaintiff's right of action. This is true of the law of negligence, and also generally of modern strict liability whether derived from statute or common law."

Cited by Harper and James under the foregoing is 2 Restatement of Torts § 430, which states:

"In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the act be a legal cause of the other's harm."

The term of the policy involved in this action was September 1, 1964 to September 1, 1965. The correspondence relied upon by the majority opinion is dated in September and October of 1961, almost four years prior to the time the instant policy took effect. The record is devoid of any facts making this correspondence relevant to the

policy in question, other than by inference. Such correspondence is more relevant to the issues of waiver or estoppel which were not considered by the trial court.

A contract of insurance must be construed as a whole, and if possible, all its parts are to be harmonized, and each part given force and effect. Watkins v. Federal Life Ins. Co., 54 Idaho 174, 29 P.2d 1007 (1934); 44 C.J.S. Insurance § 298, p. 1196. The majority opinion fails to consider the applicability of other contract provisions in relationhip to the typewritten endorsement, which by its own terms substitutes the word "accident" for "occurrence" and adds to the definition of "Products."

In Miller v. World Ins. Co., 76 Idaho 355, 283 P.2d 581 (1955), it is stated:

"It is the function of the Court to construe a contract of insurance as it is written, and the Court by construction cannot create a liability not assumed by the insurer, nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability."

See also: Coburn v. Fireman's Fund Ins. Co., 86 Idaho 415, 387 P.2d 598 (1963); Thomas v. Farm Bureau Mut. Ins. Co., 82 Idaho 314, 353 P.2d 776 (1960); Rosenau v. Idaho Mut. Benefit Ass'n, 65 Idaho 408, 145 P.2d 227 (1944). The majority opinion states "The major thrust of this provision (the change endorsement) directs itself to coverage and protection * * *," and ignores the explicit terms of General Condition 16, defining the territorial limitations. In effect the policy and the endorsement are being extended beyond the plain language, and a new liability is created.

My interpretation of the terms of this policy is as follows: General Change Endorsement No. 1, Provision No. II states that with respect to seeds, the word "accident" would be substituted for the word "occurrence" whenever used. The second part of the provision purports to amend the definition of "Products," to include errors of the type commonly associated with a seed business, but actually states: "To protect the Insured *against liability imposed* by * * * errors in mechanical mixtures * * * germination failure * * *." (Emphasis added.)

In general, this policy provides for products liability coverage, which is distinguished from ordinary liability coverage which only provides insurance *for on-premises accidents* or *accidents that occur before completion of off-premises activity.* Loveman, Joseph & Loeb v. New Amsterdam Cas. Co., 233 Ala. 518, 173 So. 7 (1937); Smedley Co. v. Employers Mut. Liab. Ins. Co., 143 Conn. 510, 123 A.2d 755 (1956); Carter v. Nehi Beverage Co., 329 Ill.App. 329, 68 N.E.2d 622 (1946); Hultquist v. Novak, 202 Minn. 352, 278 N.W. 524 (1938); Farmers Co-op. Soc. No. 1 of Quanah v. Maryland Cas. Co., 135 S.W.2d 1033 (Tex.Civ.App.1940).

Coverage B affords protection against liability only to property damage occasioned by insured's defective product but not for the value of the defective product itself. (See Exclusions—Part I(f) (4) quoted in the majority opinion.) St. Paul Fire and Marine Ins. Co. v. Northern Grain Co., 365 F.2d 361 (8th Cir. 1966); Bowman Steel Corp. v. Lumbermens Mut. Cas. Co., 364 F.2d 246 (3d Cir. 1966); Pittsburgh Plate Glass Co. v. Fidelity and Cas. Co., 281 F.2d 538 (3d Cir. 1960); Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., 63 Cal.2d 602, 47 Cal.Rptr. 564, 407 P.2d 868 (1965).

Appellant contends that the general policy condition, that it "applies to occurrences which arise within the United States of America, its territories or possessions, or Canada," is controlling. Appellant asserts that the "occurrence" or "accident" which gave rise to respondents' liability was the loss of the Mexicans' crop, and that such "accident" (occurrence) was not within the United States, but in fact took place in Mexico. On the other hand, respondents point out that the contract for sale of the beans was made at Buhl, Idaho; that delivery and payment for the seed beans

was made at Nogales, Arizona, and that the application and mixing of the chemicals on the beans took place at Buhl. Respondents then contend that any damages sustained by the growers came as a direct result of Shields' activities within the United States of America, and therefore, the territorial exclusion is not applicable.

The issue for resolution is narrowed to whether the place of the negligence (improper application of chemicals), or the place of sale or the place of delivery (in the United States), or the place of the loss (Mexico), is the controlling factor in determining the place of "occurrence" (accident) insofar as the territorial condition of the policy is concerned.

Extensive research has failed to reveal cases dealing with the issue regarding the territorial condition of the policy. Counsel for the respective parties have cited numerous cases of an analogous nature and dealing with correlative issues; it thus becomes necessary to rely upon the reasoning of those analogous cases.

Authorities dealing with the issue of the time condition of a policy which includes products hazard insurance present a factual pattern in which the sale of a particular defective article takes place during the policy period, but the defect in the article sold manifests itself with resulting damages only after expiration of the policy. It is to be noted that the territorial condition here is embodied in the same paragraph that establishes the policy period, which is generally the case in the policies discussed in the cases hereinafter cited. Thus the term "occurrence" (accident) should be given the same meaning with respect to the territorial conditions as it is given with respect to the policy period or time conditions. Authorities holding that there is no coverage where a defect manifests itself after the expiration of the policy period, although the article involved was sold during the term of the policy period are: Palardy v. Canadian Universal Ins. Co., 360 F.2d 1007 (2d Cir. 1966); First Inst. Co. of Hawaii v. Chapman, 355 F.2d 49 (9th Cir. 1965); Protex-

A-Kar Co. v. Hartford Acc. & Indem. Co., 102 Cal.App.2d 408, 227 P.2d 509 (1951); Landerman v. United States Fid. & Guar. Co., 25 Conn.Sup. 297, 203 A.2d 150 (1964); Troy v. London & Lancashire Indem. Co., 129 N.Y.S.2d 84 (Sup.Ct.1953); Silver Eagle Co. v. National Union Fire Ins. Co., 423 P.2d 944 (Or.1967). Cf. George W. Deer & Son v. Employers Indem. Corp., 77 F.2d 175 (7th Cir. 1935).

Other authorities dealing with an analogous situation are: Orchard Auto Parts Co. v. Agricultural Ins. Co., 340 F.2d 948 (9th Cir. 1965); Service Welding and Mach. Co. v. Michigan Mut. Liab. Co., 311 F.2d 612 (6th Cir. 1962); Bitts v. General Acc. Fire & Life Assur. Corp., 282 F.2d 542 (9th Cir. 1960); Tidewater Ass'd Oil Co. v. Northwest Cas. Co., 264 F.2d 879 (9th Cir. 1959); Loveman, Joseph & Loeb v. New Amsterdam Cas. Co., 233 Ala. 518, 173 So. 7 (1937); Carter v. Nehi Beverage Co., 329 Ill.App. 329, 68 N.E.2d 622 (1946); Tillery v. Pelican Ice & Cold Storage, Inc., 184 So. 2d 65 (La.Ct.App.1966); Smith v. Maryland Cas. Co., 246 Md. 485, 229 A.2d 120 (Md.Ct.App.1967); Hultquist v. Novak, 202 Minn. 352, 278 N.W. 524 (1938); Blohm v. Glens Falls Ins. Co., 231 Or. 410, 373 P.2d 412 (1962); Farmers Co-op. Soc. No. 1 of Quanah v. Maryland Cas. Co., 135 S.W.2d 1033 (Tex.Civ.App.1940). Cf. Upper Columbia River Towing Co. v. Maryland Cas. Co., 313 F.2d 702 (9th Cir. 1963); Ritchie v. Anchor Cas. Co., 135 Cal. App.2d 245, 286 P.2d 1000 (1955). Those cases dealt with insurance policies which specifically excluded "products liability" coverage, but which did afford coverage for liability for accidents or occurrences happening on the insured's premises. The typical factual pattern in this line of cases is that a defective product is sold or is negligently handled on the premises, but this defect or negligence does not manifest itself until the article has been removed from the premises, and after removal the event occurs which causes the injury. Under this situation the courts are almost unanimous in their holding that the insurance policies do not afford coverage, because they did not

insure against the *causes of accidents, but rather against the liability of the party responsible for injuries or damages suffered.* The injuries were suffered or damages resulted off the premises and hence the policies were held not to cover the insureds' liabilities. In this regard, note that the endorsement specifically states "To Protect the Insured *against liability* imposed \* \* \*." (Emphasis added.) The majority opinion completely ignores this fact.

A third line of pertinent cases is that in which the policies exclude "accidents" (occurrences) that occur after completion of the work by the insureds. The typical situation is one in which the insured installs or services a piece of equipment (either on or off insured's premises) and the job is done in an improper manner. Injury results later. The policy does not insure against "operations, if the occurrence arises after such have been completed." The courts find no coverage of the insured because the "occurrence" (accident) happened after the operations were completed even though they were performed in an improper manner. See New Amsterdam Cas. Co. v. Ellzey, 240 F.2d 618 (5th Cir. 1957); United States Sanitary Specialties Corp. v. Globe Indem. Co., 204 F.2d 774 (7th Cir. 1953); Standard Acc. Ins. Co. v. Roberts, 132 F.2d 794 (8th Cir. 1942); Employers Ins. Co. of Ala. v. Rives, 38 Ala.App. 411, 87 So.2d 646 (1956); Smedley Co. v. Employers Mut. Liab. Ins. Co., 143 Conn. 510, 123 A.2d 755 (1956); Hutchinson Gas Co. v. Phoenix Indem. Co., 206 Minn. 257, 288 N.W. 847 (1939); Smith v. United States Fid. & Guar. Co., 142 Neb. 321, 6 N.W.2d 81 (1942); Berger Bros. Elec. Motors, Inc. v. New Amsterdam Cas. Co., 293 N.Y. 523, 58 N.E.2d 717 (1944); Crook v. Kalamazoo Sales & Serv., 82 R.I. 387, 110 A.2d 266 (1954); Baker v. Maryland Cas. Co., 73 R.I. 411, 56 A.2d 920 (1948); Butler v. United States Fid. & Guar. Co., 197 Tenn. 614, 277 S.W.2d 348 (1955); Foster Trailer Co. v. United States Fid. & Guar. Co., 190 Tenn. 181, 228 S.W.2d 107 (1950); Pan American Ins. Co. v. Cooper Butane Co., 157 Tex. 102, 300 S.W. 2d 651 (1957); Neumann v. Wisconsin Natural Gas Co., 27 Wis.2d 410, 134 N.W.2d 474 (1965). See also Koehring Co. v. American Auto Ins. Co., 353 F.2d 993 (7th Cir. 1965); Clauss v. American Auto. & Ins. Co., 175 F.Supp. 641 (E.D.Pa.1959).

These lines of cited authority, i. e., the "products hazard," the "on premises," and the "completion of work" cases distinguish between the act which causes the injury or damage—sale—negligent handling—defective product—improper installation—and the injury itself. The authorities make no distinction as to whether the liability of the insured to the injured party is based on negligence sounding in tort, or on breach of warranty sounding in contract. In an ordinary negligence situation, where the negligent act takes place at one location and at a certain time, but where the injury does not occur until later at another location, it is not considered that the accident was the commission of the negligent act—the accident is considered as occurring where the injury takes place. The same is true in a breach of warranty situation. Although the product may be defective when sold, the accident or occurrence which causes the injury which in turn gives rise to the insured's liability, does not occur until or at the place of the manifestation of the defect, to the damage or injury of the user.

It is to be kept in mind that the statement of coverage B, concerning property damage liability (which the majority opinion admits is that which we are primarily concerned), as contained in this policy, is "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *injury to or destruction of property, including the loss of the use thereof.*" The majority opinion states "The loss suffered resulted from the loss of a crop, or the use of the land." I have no quarrel with such statement. In fact, it is an admission that Coverage B should be the controlling coverage provision of the policy. This provision

would become effective on the insured's behalf only after there is "damage because of injury to or destruction of property." The fact that Shields may have improperly mixed and treated the seed beans at Buhl, or that the seed beans were delivered and paid for at Nogales, Arizona, does not enlarge the declaration of the policy coverage. Until there are "damages because of injury," etc., there is no basis for liability on the part of Manufacturers under the policy. Here the damages arose only after the seeds were planted in Mexico and failed to germinate. The "Policy Period, Territory" condition renders the policy applicable only to "occurrences" (accidents) "within the United States, its territories or possessions, or Canada." Thus, under the cases discussed, the conclusion is inescapable that Coverage B does not afford the coverage which respondents seek.

Shields has cited cases for the proposition that the place and time of the commission of the negligence or sale of the defective product is the determining factor for deciding when and where the "occurrence or accident" takes place. Those cases are: Employers' Liab. Assur. Corp. v. Youghiogheny & Ohio Coal Co., 214 F.2d 418 (8th Cir. 1954); Karpe v. Great Am. Indem. Co., 190 Cal.App.2d 226, 11 Cal. Rptr. 908 (1961); Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958); Brant v. Citizens Mut. Auto. Ins. Co., 4 Mich.App. 596, 145 N.W.2d 410 (1966); Perma Fit Shoulder Pad Co. v. Tailored Trend, Inc., 147 N.Y.S.2d 356 (Sup.Ct.1955); and Kelley v. Indemnity Ins. Co., 252 App.Div. 58, 297 N.Y.S. 228 (1937).

Kelley v. Indemnity Ins. Co., supra, involved a special rider to the policy which covered accidents arising after the policy period for products sold during the policy period. However, in Troy v. London & Lancashire Indem. Co., 129 N.Y.S.2d 84 (Sup.Ct.1953), it was held that the insurer was liable only for accidents which occurred during the policy period, the court basing its decision on the ground that the policy explicitly limited application of the policy

to accidents during the policy period. Therein the court distinguished Kelley v. Indemnity Ins. Co., supra, on the ground that in the Kelley case the general insuring provision of the policy had been eliminated and replaced by a special endorsement by which the insured obtained protection for injuries which might occur at any time.

In Perma Fit Shoulder Pad Co. v. Tailored Trend, Inc., supra, the New York court did not have the policy before it and merely allowed the insured to amend its complaint if necessary. Karpe v. Great Am. Indem. Co., supra, involved the issue of the insurance company's liability for a cow left with the insured by another party— a bailment relationship. The court held the transaction was within an exclusionary provision of the policy. This opinion is not persuasive.

In Brant v. Citizens Mut. Auto. Ins. Co., supra, the Michigan Court of Appeals held that the sale of a wrong article was an accident and thus the policy excluding off-premise "accidents" did not exclude coverage. This case was followed in Atkins v. Hartford Acc. & Indem. Co., 7 Mich.App. 414, 151 N.W.2d 846 (1967), which determined that the sale of a wrong drug was an "accident" so that the policy provisions excluding "products hazards" did not apply and thus there was coverage. The cases from the Michigan Court of Appeals are part of a very small minority.

Shields has also cited the cases of Texas Motorcoaches, Inc. v. A.C.F. Motors Co., 154 F.2d 91 (3d Cir. 1946), and Chapman v. Brown, 198 F.Supp. 78 (D. Hawaii 1961), aff'd, 304 F.2d 149, 4 A.L.R.3d 490 (9th Cir. 1962), to the effect that a warranty would be breached at the time and place of sale. With this contention I have no argument, but such a question is more aptly involved on the issue of the seller's liability to the purchaser rather than on the issue of the liability of the seller's insurance carrier. Both of those cases involved the issue of liability of the seller to the purchaser, and not the issue as to coverage afforded by the seller's insurance carrier.

It is interesting to note that in First Ins. Co. of Hawaii v. Chapman, 355 F.2d 49 (9th Cir. 1965), the court held that where the article causing the injury had been sold during the policy period, but the injury did not occur until after termination of the policy, the clause which excluded "accidents" after the policy period, rendered the insurer not liable on the policy. That action was instituted by plaintiff Chapman as the injured party against the insurance company. Chapman, the plaintiff, was the same person—the injured purchaser—who maintained the action for damages against the seller in the case of Chapman v. Brown, supra.

It is my conclusion that under the policy provisions there was no coverage for the loss which occurred in Mexico.

Shields contends that the typewritten endorsement is ambiguous and must be construed against the insurer. With this contention, I agree. Watkins v. Federal Life Ins. Co., 54 Idaho 174, 29 P.2d 1007 (1934). Shields also contends that the endorsement provides coverage in the instant case.

The endorsement states that it is an amendment of the definition of "Products." Yet, the term "products" is not elsewhere defined in the policy. "Products Hazard" is the closest defined word to "products." The endorsement then goes on to say: "To Protect the Insured against *liability imposed* by * * * mechanical mixtures * * *." (Emphasis added.) This language indicates an insuring agreement.

Thus the endorsement is susceptible to two constructions. The first is that it amended the definition of "products" or "products hazard" to make it clear that errors of the type mentioned were not excluded from coverage B. I believe that this was the true intention of the amendment. See St. Paul Fire & Marine Ins. Co. v. Northern Grain Co., 365 F.2d 361 (8th Cir. 1966), where the insurance company contended that an error in delivery of seeds was not covered.

However, construing the endorsement as an additional coverage, which is the position most favorable to the insured, it is still my conclusion that the policy did not cover the transaction.

The endorsement only insures against *liability imposed*. Thus, taking the endorsement as another statement of coverage, it most logically would become a part of the policy under Part I, *"Liability Insuring Agreements."* The endorsement would be, in effect, a "Coverage C," additional to coverages A [Bodily Injury Liability] and B [Property Damage Liability].

However, General Condition No. 16 applies to Parts I and II, and "Coverage C" would still be subject to condition No. 16. *Liability imposed* necessarily includes the element of damage or injury, and according to the overwhelming weight of authority hereinbefore cited, the damage or injury did not occur in the United States.

Even if I should consider the endorsement as another insuring agreement altogether, i. e., a Part III, separate and distinct from Parts I and II, there still could be no coverage. Condition No. 16 is called a *"General Condition"* and it applies to the policy as a whole. If General Condition 16 did not apply, then there would not be any time limit or territorial limit on the policy whatsoever. If I were to accept respondent's position, then if Shields erred in mixing seeds, but for some reason they were not planted for twenty years, then Manufacturers would be liable at that time. If respondent's position is correct, then no matter where these seeds were planted, the insurance company would be subject to liability.

The other clauses denominated "General Conditions" have the following titles: "17. Other Insurance; 18. Premium; 19. Inspection and Audit; 20. Assistance and Cooperation of the Insured; 21. Subrogation; 22. Changes; 23. Assignment; 24. Cancellation; 25. Terms of Policy conformed to statute; 26. Declarations; 27. Reciprocals." All of these clauses, including No. 16, apply to all coverages and insuring agreements. I do not believe Shields could contend that with respect to the endorsement, it would not have to give assist-

ance and cooperation to Manufacturers; that Manufacturers would not be subrogated to Shields' rights, and that the policy could not be cancelled upon proper notice. In other words, the endorsement is still subject to all of the "General Conditions" of the policy.

In effect, Shields is trying to assert that it had worldwide coverage. The record before this court reflects that such a coverage is available for an additional premium. The additional premium is charged because of diversity of the laws of different countries in relation to damages. The effect of foreign laws is present in the instant case. Opportunity to mitigate damages was lost because of Mexico's law relating to permits to plant seeds, thus resulting in a delay of replanting. It is common knowledge that premiums are based not only on the likelihood of injury, but also on the amount of damage that may result.

If Shields had wished to purchase worldwide coverage, it could have done so. The fact that Shields did not purchase such coverage does not justify having this court write into the contract the worldwide coverage. This court cannot by construction create a liability which the insurer has not assumed. Lively v. City of Blackfoot, 91 Idaho 80, 416 P.2d 27 (1966); Thomas v. Farm Bureau Mut. Ins. Co., 82 Idaho 314, 353 P.2d 776 (1960).

The writer of the majority opinion states "To me it is abundantly clear that the liability of respondents which was caused by the error in mechanical mixtures is precisely the protection against which appellant insured the respondents in General Change Endorsement No. 1 * * *." No one has ever disputed that fact. Liability caused by erroneous mechanical mixture was insured against. Liability caused by many errors of various types was insured against. But it is still *liability* that is insured against and not the fact of the errors themselves, and the conclusion is inescapable that the liability could not arise until and unless there was damage, regardless of what type of error gave rise to the liability. When the

damages occurred in Mexico, the policy did not cover those damages because of General Condition No. 16.

In this case, there was an unusual endorsement to the policy, and if the majority opinion would adhere to its position that the "occurrence" was in Idaho, in a case involving no endorsement then every insurance policy within this state would be turned inside out. Those persons having policies excluding products hazards because the "occurrence" happened away from their premises would be given coverage, because according to the majority opinion, the occurrence is the act of negligence. Those persons having products hazard insurance now, but who did not when an article was sold, would have no coverage.

It is my conclusion that under the policy provisions and conditions, there was no coverage for the damages which occurred by non-germination of the seed beans in Mexico.

Shields also contends that the duty of Manufacturers to defend the principal action is a larger or greater one than the duty to pay any judgment, citing cases for this proposition, and asserts that under any circumstances Manufacturers was under the obligation to assume the defense in the principal action. This proposition may well be true in a situation where the injured party's complaint alleges facts which may or may not give rise to coverage, dependent on a resolution of the facts by the trier of facts. An example of such situation appears in Pendlebury v. Western Cas. & Sur. Co., 89 Idaho 456, 406 P.2d 129 (1965), where this court required an insurer to defend the driver of a vehicle. The facts reflected therein would have afforded no coverage if the vehicle was owned by the driver, but if the driver was not the owner but rather was using the vehicle with the actual owner's consent, the owner's policy would have afforded coverage. Therein this court stated: "An insurer is obligated to defend even though the complaint fails to state a claim covered by the policy, where the facts of the case, if established, present

a potential liability of the insured. Doubt as to the obligation of an insurer to defend should be resolved in favor of the insured." However, when, as here, the facts affirmatively establish that the principal action is one which comes within the exclusionary provisions of the policy, the insurer is under no obligation to defend. Paulin v. Fireman's Fund Ins. Co., 1 Ariz.App. 408, 403 P.2d 555 (1965); Remmer v. Glens Falls Indem. Co., 140 Cal.App.2d 84, 295 P.2d 19, 57 A.L.R.2d 1379 (1956); Smedley Co. v. Employers Mut. Liab. Ins. Co., 143 Conn. 510, 123 A.2d 755 (1956); Blohm v. Glens Falls Ins. Co., 231 Or. 410, 373 P.2d 412 (1962). Therefore, I believe that Manufacturers was under no obligation to defend the principal action.

Manufacturers contends that there are certain unresolved factual issues presented by the record before the trial court and this court. I.R.C.P. 56(c) provides in part:

> "The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law." (Emphasis added.)

Shields has presented as a basis for recovery against appellant the proposition that Manufacturers waived certain policy provisions, or that it is estopped to deny its liability thereunder. Various affidavits, interrogatories and parts of depositions appear of record, as well as correspondence between the parties. The insured Shields asserts that the record as presented reflects that Manufacturers waived the territorial condition, and was also estopped to deny liability in that it collected premiums on all sales of the insured, which included sales to foreign countries or persons outside the territorial limits of the United States. Under the terms of the policy, premiums for the products liability coverage were to be computed on the basis of actual sales. An initial deposit was made by the insured,

with the sales to be computed at the close of the year, and any required adjustment on the basis of actual sales was then to be charged against prepayment with balance remitted to Shields, or an additional payment to Manufacturers, as the case should be. Shields claims that Manufacturers knew or should have known that the sales included foreign sales and since premiums were collected on the gross sales, Manufacturers is estopped to deny liability. However, Manufacturers claims that the sales figures furnished to it by Shields were not broken down to reveal foreign sales as included in the gross figure, and thus it was without knowledge of any foreign sales.

One affidavit of Shields' bookkeeper states:

> "During the period which Shields (insured) has carried the liability with the said insurance company, it has been customary for a representative of the insurance company to come to Buhl, Idaho and inspect the books of Shields with regard to the sales made during the period involved. This examination is normally made by an insurance company representative on or shortly before the 1st of September of each year."

An affidavit filed by an employee of Manufacturers who called at Shields' office recites:

> "That he was never informed by Shields employees or anyone else that Shields sold or distributed seed outside of the United States or Canada * * * That he never personally audited or inspected the books or sales ledgers of Shields but relied solely upon the figures and information furnished him by employees of Shields."

Correspondence between the parties before the court is to the effect that the insured desired as much coverage as it could receive and that the insurer indicated that insured did have a broad coverage, with certain exceptions.

All inferences to be derived from the evidence on a motion for summary judgment

are to be resolved against the moving party. Merrill v. Duffy Reed Const. Co., 82 Idaho 410, 353 P.2d 657 (1960). If any genuine issue of material fact is presented by the record, summary judgment cannot be granted. Merrill v. Duffy Reed Const. Co., supra. Here it is evident that there are genuine issues of material fact that are unresolved, and thus summary judgment on the theory of waiver or estoppel could not be granted.

The summary judgment should be reversed and the cause remanded for further proceedings.

SMITH, C. J., concurs.